## UNITED STATES *v.* WALLER ET AL.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 697.   Argued March 14, 15, 1917.—Decided April 9, 1917.

By force of the Clapp Amendment of 1906–1907, chaps. 3504, 2285, 34 Stat. 353, 1034, lands in the White Earth Reservation allotted and patented in trust to an adult mixed-blood Indian belong to him with all the rights and incidents of full ownership by persons of full capacity, including the right of alienation; and when he conveys them the United States cannot maintain for his benefit, a suit to annul the deed upon the ground that it was procured by fraud.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Kearful* for the United States:

The preëxisting national guardianship over mixed-blood Indians of the White Earth Reservation was not terminated by the Clapp Amendment.

Only those mixed bloods who actually lived the Indian tribal life were recognized as members of the tribe. Treaty of August 2, 1847, 9 Stat. 904, 905; Treaty of March 19, 1867, 16 Stat. 719, 720. The Treaty of 1867 treated full bloods and mixed bloods alike as dependent Indians. Neither the general allotment act of February 8, 1887, 24 Stat. 388, nor the Act of January 14, 1889, 25 Stat. 642, made any distinction between the two, and the Act of April 28, 1904, 33 Stat. 539, preserved the same equality of treatment.

This status was not changed by the Clapp Amendment. The only distinction made therein was in the tenure of the titles to their allotments. In the Indian appropriation acts since 1889, including the Act of 1906 which carries the Clapp Amendment, Congress has recognized the duty of protection owing to both full bloods and mixed bloods

as dependent Indians. Those acts show that the tribal relation and dependent condition of incompetent mixed bloods were not intended to be disturbed by the Clapp Amendment; and in expending the funds appropriated for their relief and civilization the Interior Department has followed the manifest intent of Congress not to discriminate because of blood. See Reports of Commissioner of Indian Affairs, 1912, 1915.

The national guardianship is not affected by the vesting by the Clapp Amendment of the fee simple titles. The grant of citizenship to Indians or their subjection to state laws is not incompatible with a continuance of such guardianship. *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 308; *Heckman* v. *United States*, 224 U. S. 413, 437; *United States* v. *Sandoval*, 231 U. S. 28, 39, 47; *United States* v. *Pelican*, 232 U. S. 442, 450; *Perrin* v. *United States*, 232 U. S. 478, 481; *United States* v. *Noble*, 237 U. S. 74, 79; *United States* v. *Nice*, 241 U. S. 591, 598–601. These decisions recognize the power of Congress to determine when and how the national guardianship shall be terminated, but so long as the Indians are maintained in a condition of pupilage or dependency it cannot be said that Congress, by the mere grant of unrestricted title, intended to emancipate them. The cases cited *supra* were not grounded on the fact that the Indians were not vested with such titles in fee. The United States owes to dependent Indians a "duty of protection," and that duty is not to be measured by property interests. *Heckman* v. *United States, supra; United States* v. *Nice, supra*. The mere grant of unrestricted title in fee to helpless Indians does not of itself satisfy the duty.

The *Heff Case*, 197 U. S. 488, was founded upon a misconception of the will of Congress respecting the emancipating of allotted Indians. It was overruled by *United States* v. *Nice, supra*, but before this its effect was nullified by the Act of May 8, 1906, 34 Stat. 182, amending § 6

of the general allotment act. The Clapp Amendment,
enacted shortly thereafter, contains no indication of an
intention to repeal the prior act as to mixed-blood Chippe-
was. It passed fee simple title to trust allotments held
by certain tribal Indians regardless of their competency
by declaring that trust deeds "heretofore or hereafter"
issued to them" should have that effect. The inclusion,
of trust instruments "hereafter " to be issued could only
have come from a desire to grant full title without granting
to incompetents the citizenship which would come under
the Act of 1906 by allowing a patent in fee.

The clause "or such mixed bloods upon application
shall be entitled to receive a patent in fee simple " is not
an absolute direction to issue such patents. Under it
adult mixed bloods have the option to apply for citizen-
ship and subjection to state laws (Act of May 8, 1906,
*supra*), or to remain as tribal Indians subject to the exclu-
sive jurisdiction of the United States (*ibid.*). The clause
defining the trust allotments to which fee titles passed to
be those "heretofore or hereafter" held by adult mixed
bloods is utterly inconsistent with any intention to termi-
nate the guardianship. As no transfer could theretofore
have been made, the word "heretofore " referred to allot-
ments of deceased Indians, and the intention was to pass
fee title to their heirs. Congress surely did not intend to
emancipate such decedents *nunc pro tunc* or emancipate
from federal guardianship all full bloods, minors, or tribal
relatives on other Chippewa reservations, who might in-
herit such allotments. The policy of emancipating in-
dividual tribal Indians when they have become and are
found capable of managing their own affairs has long been
settled, and frequently stated in acts of Congress. See
Acts of July 1, 1902, 32 Stat. 636, 639; March 2, 1907,
34 Stat. 1221; May 18, 1916, 39 Stat. 123, 128. The
Clapp Amendment purporting to do no more than pass
fee title, cannot be held to involve a finding that all

mixed bloods are competent. Consistently with its own language, with other parts of the same act, and every annual Indian act since, mixed bloods were and are treated as dependent Indians, with full bloods.

The capacity of the United States to sue for the protection of its Indian wards exists in every justiciable case of wrong suffered by them. *United States* v. *Kagama,* 118 U. S. 375, 384; *United States* v. *Rickert,* 188 U. S. 432, 437, 444; *Heckman* v. *United States,* 224 U. S. 413, 437, 441; *United States* v. *Noble,* 237 U. S. 74, 79; *United States* v. *Nice,* 241 U. S. 591, 597; *United States* v. *Gray,* 201 Fed. Rep. 291, 293; *United States* v. *Fitzgerald,* 201 Fed. Rep. 295, 296. These decisions recognize the right of the United States to sue on behalf of dependent Indians in fulfillment of its obligations springing from its peculiar relation to them.

It is no answer to say that the Indians themselves have a right to sue for the relief to which they are entitled. The same conditions of helpless dependency which operated to deprive them of their property would likewise preclude them from undertaking the litigation necessary to obtain relief. *Heckman* v. *United States,* 224 U. S. 413, 438; *United States* v. *Gray,* 201 Fed. Rep. 291, 294.

Legislation affecting the Indians is to be construed in their interest, *Choate* v. *Trapp,* 224 U. S. 665, 675; *United States* v. *Nice,* 241 U. S. 591, 599; a construction of the Clapp Amendment which would deny all relief to these Indians would not be in their interest but in the interest of unscrupulous speculators. *United States* v. *Thurston County,* 143 Fed. Rep. 287, 289.

*Mr. Marshall A. Spooner* for Waller *et al.*

MR. JUSTICE DAY delivered the opinion of the court.

This case is here upon a certificate from the Circuit Court of Appeals for the Eighth Circuit, from which it

appears that the United States brought a suit in the District Court of the United States for the District of Minnesota for the purpose of cancelling and annulling a warranty timber deed from Ah-be-daun-ah-quod and Ah-sum, Indian allottees on the White Earth Reservation in Minnesota, to Mamie S. Waller, dated November 4, 1907, and a certain warranty deed from the same Indians to L. S. Waller, dated January 6, 1908. The District Court dismissed the bill on the ground that the plaintiff had no capacity to maintain the suit and upon a further ground that the court had no jurisdiction to hear and consider the same.

The Court of Appeals certifies the bill upon which suit was brought in the District Court, wherein it is alleged that the United States brought the action upon behalf of Ah-be-daun-ah-quod and Ah-sum, Indian allottees in the White Earth Reservation in Minnesota. The acts of Congress under which the allotments were made to the Indians named are set forth, and it is averred that these acts provided that the lands in question should be held in trust by the United States for a period of twenty-five years; that the Indians for whom the suit was brought were Chippewa Indians of the White Earth Reservation, residing on the reservation, and were husband and wife and adult mixed-blood Indians.

It is averred that since the establishment of the White Earth Reservation the United States, in pursuance of its treaties and agreements with the tribes and bands of Chippewa Indians in the State of Minnesota, and in pursuance of its laws, has had and exercised through the Department of the Interior and the Office of Indian Affairs the function of guardian, protecting and defending said tribes and bands and the individual members thereof in the enjoyment and possession of their property rights. That before the commission of the acts of the defendants complained of there were duly allotted to Ah-be-daun-ah-quod and

Ah-sum certain tracts of land in the White Earth Reservation, which are described.

That afterwards, in December, 1907, the defendant, Lucky S. Waller, negotiating with these two Indians for the purchase of a portion of the timber upon their allotments, paid to them $50 as partial payment for such timber, and caused them to sign a certain paper, produced by him, by placing their thumb marks thereon. That as an inducement to procuring the execution of this paper, Waller falsely and fraudulently stated that it was merely a receipt for the payment. That neither Indian could read or write, and each was obliged to rely on Waller for understanding and knowledge of the contents of the instrument, and that so relying upon him and upon his false statements, they believed the instrument to be but a receipt for the money paid.

That in January, 1908, a further payment of $75 was made by Waller to the two Indians, and another paper executed by them under similar circumstances and representations. That in June, 1910, and December, 1911, sums of $10 were paid by Waller to the Indians; that such sums aggregating $145, were all paid with the understanding and belief on the part of the Indians that they were part of the purchase price of a part of the timber upon the lands; and that no other or further moneys have been paid by Waller to the Indians.

That in December, 1911, the Indians for the first time learned, and plaintiff was thereafter advised, that the land records in the offices of the registers of deeds of Mahnomen and Clearwater counties, Minnesota, showed that there had been filed for record in said offices, respectively, two instruments in writing; one, an instrument purporting to be a warranty timber deed from Ah-be-daun-ah-quod and Ah-sum to Mamie S. Waller, dated November 4, 1907, reciting the consideration for the property therein conveyed to be $500, and purporting to convey the timber

upon the lands patented to the Indians with the exception of one parcel, and the other an instrument purporting to be a warranty deed from Ah-be-daun-ah-quod and Ah-sum to L. S. Waller, dated January 6, 1908, reciting the consideration paid to be $200, and purporting to convey all of the lands patented.

That the instruments so recorded were the instruments executed by the Indians, by their thumb marks in the custom of Indians unable to read or write, and that the instruments which the Indians executed in December, 1907, and January, 1908, were not in truth and in fact the receipts which the defendant Waller falsely and fraudulently represented them to be, but were the instruments so recorded, which the Indians signed in ignorance of their contents, nature and effect, and in reliance upon the false and fraudulent representations in regard thereto made by the defendant Waller, all of which was well known to the defendant.

That Mamie S. Waller is the wife of defendant Lucky S. Waller, and the person mentioned as the grantee in the timber deed; that she gave no consideration for the timber deed or the property purporting to be conveyed thereby; that the deed was caused to be taken in her name as grantee for the mutual benefit of the defendants; that she pretends to have and claims the title to the property therein described by virtue of said timber deed, and thereby seeks to avail herself of the benefit of the fraud perpetrated in securing the timber deed from the two Indians.

That the Indians never had any negotiations with either of the defendants directly or indirectly as to the sale of the lands or of any timber thereon or in any respect other than as set forth in the bill; that they never intended to sell the lands and never did sell them or any part thereof; and that they never knowingly signed or executed any instrument conveying or in any manner alienating the

lands or any part thereof or interests or rights therein, or any timber thereon. That the instruments which were executed and recorded had and have the apparent legal effect of vesting the title to the lands and the timber thereon in the defendants, and of divesting the Indians of whatever right, title and interest in and to said lands and timber were intended and provided for them by the laws of the United States. That the sum of $145.00 paid by Waller to the Indians is grossly inadequate and disproportionate to the value of the lands and of the timber thereupon, and that the value of the lands is not less than $2,500.00 and of the timber not less than $2,000.00.

The prayer of the bill is for surrender and cancellation of the warranty timber deed and the warranty deed for the lands.

The case was appealed to the Circuit Court of Appeals for the Eighth Circuit, which court has certified to this court the following question: Has the United States capacity to maintain the suit in question on behalf of the Indians named?

The answer to the question propounded depends upon a consideration of the acts of Congress relating to these Indians. The controlling act is the so-called Clapp Amendment of June 21, 1906, 34 Stat. 325, 353; March 1, 1907, 34 Stat. 1015, 1034.

Before dealing with its interpretation, it is necessary to have in mind certain matters which are well settled by the previous decisions of this court. The tribal Indians are wards of the Government, and as such under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with the continuation of such guardianship, for it has been held that even after the Indians have been made citizens the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control,

in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property or give to them a partial emancipation if it thinks that course better for their protection. *United States* v. *Nice*, 241 U. S. 591, 598, and cases cited.

To comprehend what Congress intended to accomplish by the act in question, it is necessary to have in view the previous legislation upon this subject. Its history was given in *United States* v. *First National Bank*, 234 U. S. 245, and may be briefly summarized here.

By the treaty of March 19, 1867, 16 Stat. 719, creating the White Earth Reservation, the Chippewas of the Mississippi ceded all their land in Minnesota, except certain described tracts, to the United States, and the Government set apart the White Earth Reservation for their use, and provision was made for the certification to each Indian of not to exceed 160 acres of land in lots of 40 acres each, upon the cultivation of ten acres, provided that the land should be exempt from taxation and sale for debt and should not be alienated except with the approval of the Secretary of the Interior and then only to a Chippewa Indian. Under the general allotment act of February 8, 1887, 24 Stat. 388, provision was made for the allotment of lands in the Indian reservations in severalty, and it was provided that upon the approval of the allotments patent, therefor should issue in the name of the allottees, which should have the legal effect and declare that the United States held the land for twenty-five years in trust for the use and benefit of the Indian to whom the allotment was made, or in case of his death for his heirs, according to the laws of the State or Territory where the land was located. At the expiration of that time the United States was required to convey the same to the Indian or his heirs in fee, discharged of the trust and free of encumbrances, provided that the President of the United States might at his discretion extend the period. Conveyances or con-

tracts touching the lands before the expiration of the trust period were declared null and void. The Nelson Act of January 14, 1889, 25 Stat. 642, provided for the relinquishment to the United States of that part of the reservation remaining after the allotment, the act to become operative only upon the assent of a certain number of Indians being obtained. By the Act of February 28, 1891, 26 Stat. 794, the allotments were limited to eighty acres to each Indian, but by the Act of April 28, 1904, 33 Stat. 539, the maximum allotments of the White Earth Reservation were made 160 acres. While the lands were thus held in trust and subject to the provisions of the Act of February 8, 1887, the Clapp Amendment was passed, 34 Stat. 1015, 1034, which provides:

"That all restrictions as to the sale, incumbrance, or taxation for allotments within the White Earth Reservation in the State of Minnesota, heretofore [amended March 1, 1907, the word 'heretofore' being substituted for the word 'now'] or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple, or such mixed bloods upon application shall be entitled to receive a patent in fee simple for such allotments; and as to full bloods, said restrictions shall be removed when the Secretary of the Interior is satisfied that said adult full-blood Indians are competent to handle their own affairs, and in such case the Secretary of the Interior shall issue to such Indian allottee a patent in fee simple upon application."

As stated in the certificate, the Indians involved are adults of mixed blood, and the lands in question were duly allotted and patented to them (by trust patents, counsel agree,) before the deeds in controversy were made. We cannot escape the conviction that the plain language of this act evidences the intent and purpose of Congress

to make such lands allotted to mixed-blood Indians subject to alienation with all the incidents and rights which inhere in full ownership in persons of full capacity.

The act deals with two classes: First, adult mixed-blood Indians, as to whom all restrictions as to sale or incumbrance are removed and the trust deeds declared to pass title in fee simple, or upon application such mixed bloods are to receive fee simple patents for their allotments; and, Second, full-blood Indians, as to whom the restrictions are to continue until the Secretary of the Interior is satisfied that such Indians "are competent to handle their own affairs," at which time they are to receive patents in fee simple. This distinction between the qualifications of adult mixed and full-blood Indians is one which Congress has not infrequently applied. *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 306, 308; *United States* v. *First National Bank, supra,* at page 260.

The act thus evidences a legislative judgment that adult mixed-blood Indians are, in the respects dealt with in the act, capable of managing their own affairs, and for that reason they are given full power and authority to dispose of allotted lands. This may be a mistake of judgment as to some cases, and if the allegations of the bill set forth in the certificate in this case are true, it is quite evident that the Indians here involved were incapable of making an intelligent disposition of their lands. But Congress dealt with general conditions, and with these classes of Indians as a whole, and with authority over the subject has given to adult mixed-blood Indians the full right to dispose of the lands in question. It is not for the courts to question this legislative judgment.

In this view of the legislation and the particular act in question, we are unable to find any authority in the United States to maintain this suit in behalf of the Indians named.

In *Heckman* v. *United States*, 224 U. S. 413, it was held

that the United States could maintain a bill to cancel conveyances made by members of the Cherokee Nation in violation of restrictions imposed by acts of Congress. That case differs from the present one, in which there has been no disposition of the lands in violation of restrictions imposed by Congress upon alienation by the Indians. In the case now before us, in whatever other respect the Government of the United States may continue to hold these Indians as wards, needing and receiving protection from its authority over their persons and property, as to the lands in question the United States, in the passage of the Clapp Amendment, evidenced its purpose to grant full power and control to the class named. As to them the Government has no further interest in or control over the lands.

It does not follow that the Indians are without remedy in proper actions brought by themselves or their guardians, if there be such, for the protection of their rights. In *Dickson* v. *Luck Land Co.*, decided at this term and reported in 242 U. S. 371, this court had occasion to deal with rights concerning lands allotted and patented under the Clapp Amendment to adult mixed-blood Chippewa Indians, and speaking of the effect of the removal of the restrictions, this court said, at page 375:

"With those restrictions entirely removed and the fee simple patent issued it would seem that the situation was one in which all questions pertaining to the disposal of the lands naturally would fall within the scope and operation of the laws of the State. And that Congress so intended is shown by the Act of May 8, 1906, c. 2348, 34 Stat. 182, which provides that when an Indian allottee is given a patent in fee for his allotment he 'shall have the benefit of and be subject to the laws, both civil and criminal, of the State.' Among the laws to which the allottee became subject, and to the benefit of which he became entitled, under this enactment were those governing the

transfer of real property, fixing the age of majority and declaring the disability of minors."

We reach the conclusion that in this suit the United States was without capacity to bring the action for the benefit of the Indians named, and it follows that the question propounded must be answered in the negative.

*And it is so ordered.*