## UNITED STATES v. SHERBURNE MERCANTILE CO.

### No. 7065.

Circuit Court of Appeals, Ninth Circuit.

Dec. 13, 1933.

Wellington D. Rankin, U. S. Atty., and D. L. Egnew, Sam D. Goza, Jr., and Arthur P. Acher, Asst. U. S. Attys., all of Helena, Mont.

George E. Hurd, of Great Falls, Mont., and Verne E. Robinson and Salisbury & Robinson, all of Los Angeles, Cal., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

This is an action by the United States government to cancel a sheriff's deed to certain real property theretofore patented to the Indian heirs of an Indian allottee. The patent contained the following proviso: "The land covered by this patent is not liable for any debt contracted prior to this date, as provided by section 5 of the Act of February 8, 1887 (24 Stat. 388, 389), and the amendatory Acts of May 8, 1906 (34 Stat. 182), and June 21, 1906 (34 Stat. 325, 327)."

The trial court dismissed the action on the ground that the government had no authority to sue on behalf of the Indian patentees. It is admitted that the appellee claims under a sheriff's deed issued in pursuance of a sheriff's sale under an execution issued on a judgment rendered on a debt incurred by the Indian patentees before the issuance of the patent, and, therefore, within the terms of the above mentioned proviso. Appellee contends that the proviso in question was inserted in the patent without authority of law, and, therefore, that it is invalid; the contention being that although this proviso is contained in the statute, which is cited in the patent, as above quoted, the statutory proviso is not applicable in the case of a patent issued to the heirs of an Indian, particularly where such heirs are citizens. The Act of Congress of February 8, 1887, 24 Stat. 388, provided generally for the allotment of lands to Indians located on a reservation from the lands contained within the boundaries of such reserva-

tion. The act also provided in section 4 (25 USCA § 334) for the allotment of lands from the surveyed or unsurveyed lands of the United States not otherwise appropriated to Indians who are not residing upon a reservation. Congress, by the Act of May 8, 1906, c. 2348, 34 Stat. 182 (25 USCA § 349), amended section 6 of the Act of February 8, 1887, dealing with the question of Indian citizenship. This section authorized the issuance of patent in fee and provided that "thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent." This section (section 6) as amended (25 USCA § 404 note) also provided that where an Indian died before the expiration of a trust "said allotment shall be cancelled and the land shall revert to the United States, and the Secretary of the Interior shall ascertain the legal heirs of such Indian, and shall cause to be issued to said heirs and in their names, a patent in fee simple for said land. * * * The action of the Secretary of the Interior in determining the legal heirs of any deceased Indian, as provided herein, shall in all respects be conclusive and final."

On June 21, 1906 (34 Stat. 327 [see 25 USCA § 354]), in the act making appropriations for the Indian department, Congress again dealt with the subject of Indian allotments and provided, among other things:

"That the Act entitled 'An Act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes,' approved February eighth, eighteen hundred and eighty-seven, be, and is hereby, amended by adding the following:

"No lands acquired under the provisions of this Act shall, in any event, become liable to the satisfaction of any debt contracted prior to the issuing of the final patent in fee therefor."

If it be conceded that the amendatory Act of May 8, 1906, supra, left it in doubt as to whether or not the proviso with regard to the liability of patented lands for pre-existing debts applied to lands patented to an heir, that question is set at rest by the amendment of June 21, 1906 (34 Stat. 327) which makes the proviso applicable to all lands "acquired under the provisions of this Act."

▮ On June 25, 1910, Congress passed another act relating to the descent of lands allotted to Indians (36 Stat. c. 431, p. 855, § 1 [25 USCA § 372]). This statute authorized the Secretary of the Interior under such rules as he shall prescribe to ascertain the legal heirs of an Indian who dies intestate, to whom land had been allotted, and provided that his decision thereon should be final and conclusive. The statute also provided: "If the Secretary of the Interior decides the heir or heirs of such decedent competent to manage their own affairs, he shall issue to such heir or heirs a patent in fee for the allotment of such decedent; if he shall decide one or more of the heirs to be incompetent he may, in his discretion, cause such lands to be sold," etc.

It is true that in the Act of June 25, 1910, the proviso that the lands patented should not be subject to antecedent debts was not re-enacted but it is clear, we think, that the legislation of 1910 was not inconsistent with the proviso in the Acts of May and June, 1906, above referred to, and, consequently did not repeal such provisos by implication. Such repeals are not favored.

We conclude then that the proviso contained in the patent with reference to the liability of the land for antecedent debts was authorized by statute.

▮ The next question which arises is whether or not the government is entitled to protect the Indian owner of the patented land against sales made in violation of the proviso contained in the patent. The appellee bases its contention upon the proposition that the heirs of William Goss No. 2, the allottee, namely, William Goss No. 1, and Maggie Goss, his wife, parents of the allottee in the trust patent, and therefore his heirs at law, had previously been allotted lands in the reservation, and that by reason of such previous allotment they became citizens of the United States and of the state of Montana under the provisions of section 6 of the above-mentioned act as amended by Act of May 8, 1906 (34 Stat. 182 [see 25 USCA § 349]), which section is as follows: "That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section five of this Act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this Act, or under any law or treaty,

and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property: Provided, That the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: Provided further, That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States. * * * "

That Maggie Goss and William Goss No. 1, had become and were citizens of the United States, and the state of Montana at the time the patent in question was issued to them, is not seriously questioned by the government. The Supreme Court of the state of Montana considered that question in a criminal case involving the jurisdiction of the state of Montana in criminal matters over an Indian allottee. State v. Monroe, 83 Mont. 556, 274 P. 840. This decision, based as it is upon acts of Congress and upon the decisions of the Supreme Court of the United States, and previous decisions of the Supreme Court of Montana, upon that subject, so completely and satisfactorily disposes of the matter that we content ourselves with referring to that decision as authority for the statement that Maggie and William Goss No. 1 became citizens of the United States and the state of Montana on the issuance to them of a patent in fee simple on the land allotted to them in their own right. The government, however, contends that the question of citizenship does not terminate its right to bring suit on behalf of the Indian citizens. It claims that it is entitled to protect the Indians in their rights in lands patented to them against any claim inconsistent with the patent itself and based upon an indebtedness incurred before the patent was issued.

It is clear that the fact that the Indian patentee has become a citizen is not decisive of the right of the government to bring a suit based upon the claim that a condition of the patent has been violated, as will appear from a consideration of the decisions of the Supreme Court:

In Cramer v. U. S., 261 U. S. 219, 232, 43 S. Ct. 342, 345, 67 L. Ed. 622, the court, in dealing with the contention that the United States was without authority to maintain the suit, said: "The contention that the United States was without authority to maintain the suit in the capacity of guardian for these Indians is without merit. * * * This duty of protection and power extend to individual Indians, even though they may have become citizens. U. S. v. Nice, 241 U. S. 591, 598, 36 S. Ct. 696, 60 L. Ed. 1192, and cases cited; Heckman v. U. S., 224 U. S. 413, 436, 32 S. Ct. 424, 56 L. Ed. 820; U. S. v. Gray, 119 C. C. A. 529, 201 F. 291; U. S. v. Fitzgerald, 119 C. C. A. 533, 201 F. 295." The Supreme Court in that case quoted with approval from the decision of the Circuit Court of Appeals in U. S. v. Gray, 201 F. 291, as follows: "The civil and political status of the Indians does not condition the power of the government to protect their property or to instruct them. Their admission to citizenship does not deprive the United States of its power, nor relieve it of its duty. * * * " And from United States v. Fitzgerald, 201 F. 295, as follows: "The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies. It may maintain such suits, although it has no pecuniary interest in the subject-matter thereof, for the purpose of protecting and enforcing its governmental rights and to aid in the execution of its governmental policies."

In United States v. Waller, 243 U. S. 452, 37 S. Ct. 430, 432, 61 L. Ed. 843, the Supreme Court was dealing with the right of the United States to maintain a suit on behalf of certain Indian allottees. The court said: "Before dealing with its interpretation, it is necessary to have in mind certain matters which are well settled by the previous decisions of this court. The tribal Indians are wards of the government, and as such under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with

the continuation of such guardianship, for it has been held that even after the Indians have been made citizens, the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property, or give to them a partial emancipation if it thinks that course better for their protection. U. S. v. Nice, 241 U. S. 591, 598, 36 S. Ct. 696, 60 L. Ed. 1192, 1195, and cases cited." It was, however, held by the Supreme Court in that case that as the Indian allottees were adults of mixed blood and had acquired title in fee simple, the alienation of such lands by the Indian allottees in such case could not be attacked by the United States because it had no capacity to sue in their behalf. The court there, however, pointed out the distinction between such a case where the Indian allottees acted within their rights, but improvidently, and one where the purpose of the action by the United States was to enforce a restriction in the patent itself. In pointing out that distinction the court said: "In Heckman v. United States, 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820, it was held that the United States could maintain a bill to cancel conveyances made by members of the Cherokee Nation in violation of restrictions imposed by acts of Congress. That case differs from the present one, in which there has been no disposition of the lands in violation of restrictions imposed by Congress upon alienation by the Indians. In the case now before us, in whatever other respect the government of the United States may continue to hold these Indians as wards, needing and receiving protection from its authority over their persons and property, as to the lands in question the United States, in the passage of the Clapp Amendment, evidenced its purpose to grant full power and control to the class named. As to them the government has no further interest in or control over the lands."

These decisions of the Supreme Court definitely hold that the mere fact that the allottee is a citizen of the United States does not prevent the United States from bringing suit on behalf of the Indian patentees to enforce a restriction against alienation contained in their patent.

■ The next question is whether or not it is essential to the maintenance of this action by the government that it be shown that the allottees were still maintaining their tribal relations and therefore were wards of the government notwithstanding their citizenship.

It is clear we think that this is a false quantity in the problem. As pointed out by the Supreme Court in U. S. v. Waller, supra, the fact that the Indian was still a ward of the government in some respects did not entitle the government to maintain the action with reference to property which is vested completely and fully in the Indian allottee without restriction or reservation. As held in the above-cited cases, the extent to which the Indian should be emancipated from his wardship is exclusively for the determination of Congress and the wardship is not inconsistent with the full rights of citizenship. It would follow where allotted land was patented to an Indian with a reservation or restriction required by Congress that Congress limited the extent of the emancipation of the Indian to the extent of the restriction or reservation and retained guardianship to the same extent. The restriction in question in the case at bar was placed upon alienation because of antecedent debts for the purpose of safeguarding the rights of the Indian and to that extent control over the allotted property and over the Indian was retained by the United States. See Heckman v. U. S., supra; Tiger v. Western Inv. Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738. In Heckman v. U. S., supra, it was said: "The authority to enforce restrictions of this character is the necessary complement of the power to impose them. * * * [Quoting from In the Matter of Heff, 197 U. S. 488, 509, 25 S. Ct. 506, 49 L. Ed. 848: 'Equally clear is it that Congress may enforce and protect any condition which it attaches to any of its grants. This it may do by appropriate proceedings in either a national or a state court.' " In Bowling v. U. S., 233 U. S. 528, 34 S. Ct. 659, 660, 58 L. Ed. 1080, the Supreme Court had under consideration an action brought by the United States to enforce a restriction against alienation of allotted lands. The court there said: "The confederated Peoria Indians who received allotments were made citizens of the United States by the Act of May 2, 1890, c. 182, § 43 (26 Stat. 81, 99). * * * It is contended by the appellants that when the allotment was made, and the allottee became a citizen of the United States, the guardianship of the government ceased. But this contention is plainly untenable. Tiger v. Western Inv. Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738. And it is no longer open to question that the United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed. Since the decision below, the precise question has

been determined by this court in Heckman v. U. S., 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820, and it was there held that the authority to enforce restrictions of this character is the necessary complement of the power to impose them. It necessarily follows that, as a transfer of the allotted lands contrary to the inhibition of Congress would be a violation of the governmental rights of the United States arising from its obligation to a dependent people, no stipulations, contracts, or judgments rendered in suits to which the government is a stranger, can affect its interest. The authority of the United States to enforce the restraint lawfully created cannot be impaired by any action without its consent."

The case of Smith v. No. Pac. Ry. Co. (1919) 57 Mont. 14, 186 P. 684, is strongly relied upon by the appellee as sustaining its position that the United States has no authority to sue. That case dealt with the right of an Indian who is a citizen of the United States to recover the value of land which had been taken by the Northern Pacific Railway Company for its right of way. This decision, of course, did not deal with the right of the United States government to sue, but solely with the right of the Indian allottee to bring a suit on his own behalf where he had become a citizen of the United States and had terminated his relations with the tribe. It is worthy of note in this connection that the decision of the Supreme Court of the United States In the Matter of Heff, 197 U. S. 488, 25 S. Ct. 506, 49 L. Ed. 848, is cited in the opinion of the Supreme Court of Montana as authority for its conclusion. That this decision has been expressly overruled by the Supreme Court in United States v. Nice, 241 U. S. 591, 36 S. Ct. 696, 60 L. Ed. 1192, supra, was evidently overlooked by the court.

The decision of the Supreme Court in Schrimpscher v. Stockton, 183 U. S. 290, 22 S. Ct. 107, 46 L. Ed. 203, is also relied upon by the appellee. That decision dealt entirely with the statute of limitations, and the question there decided was whether or not an Indian allottee who had made a void deed of his allotment could sue to recover the land after the running of the usual statute of limitations of the state. It was held that the statute of limitations began to run against the Indian when all restrictions were removed which would have interfered with his bringing the suit because he was under guardianship. Whether that decision should be followed now in view of the decision of the Supreme Court in Heckman v. U. S., 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820, supra, is a point we need not consider. At most, that decision merely holds that where an Indian pursues his independent right to bring a suit he may be defeated by the statute of limitations.

We conclude that the United States is the proper party to bring the action at bar, and in view of the unquestioned fact that the sheriff's deed relied upon by the appellee was made in violation of the express limitation in the Indian owner's patent the case is remanded to the trial court, with instructions to enter a decree cancelling the sheriff's deed in accordance with the prayer of the bill.