UNITED STATES v. NEZ PERCE COUNTY, IDAHO, et al. (two cases).

SAME v. LEWIS COUNTY, IDAHO, et al.

Nos. 1265, 1274, 1275.

District Court, D. Idaho, Central Division.

Aug. 29, 1936.

John A. Carver, U. S. Dist. Atty., and E. H. Casterlin and Frank Griffin, Asst. U. S. Dist. Attys., all of Boise, Idaho, for the United States.

Ray E. Durham, of Lewiston, Idaho, for defendant Nez Perce County, Idaho.

Edward C. Butler, of Lewiston, Idaho, for defendants Rural High School Dist. No. 1, Village of Lapwai, and Lapwai Valley Highway Dist.

Thomas A. Madden, of Nezperce, Idaho, for defendant Lewis County, Idaho.

CAVANAH, District Judge.

As these three cases were tried at the same time, although presenting different rights and questions, yet they can be considered and disposed of separately in one opinion.

The cases were brought by the United States against Nez Perce county and others to recover taxes paid by Indian wards of the government and to cancel taxes levied but not paid and to quiet title to the lands of two of the wards. They involve the same class of land and the same class or Indian ward, and a discussion of the same legal questions involved will be applied to each case where applicable, with a consideration of the facts separately.

At the conclusion of the plaintiff's evidence, the defendants moved for a nonsuit and dismissal, in each case, and it was agreed that in the event the motion was overruled, the court could consider the evidence offered by the defendants, subject to certain objections thereto of the plaintiff. In case No. 1265 the land assessed and taxed was held in trust by the United States for Annie Luke, and she or some one acting in her behalf without protest paid the taxes to the county for the years 1924 to 1929, inclusive. The United States now seeks to recover these taxes, which aggregate $880.64, upon the theory that as the lands so assessed were trust lands and held by it in trust for Annie Luke, an Indian ward of the Government, they are exempt from taxation under the Treaty of June 9, 1863, with the Nez Perces, which set apart the lands for the exclusive use and benefit of the tribe of Indians as an Indian reservation. The provision of the treaty relied upon is that: "Until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee, or leased, or otherwise disposed of, only to the United States, or to persons then being members of the Nez Perce tribe, and of Indian blood, with the permission of the President, and under such regulations as the Secretary of the Interior of the Commissioner of Indian Affairs shall prescribe; * * * No state or territorial legislature shall remove the restriction herein provided for, without the consent of Congress, and no State or territorial law to that end shall be deemed valid until the same has been specially submitted to Congress for its approval." Article 3, 14 Stat. 647–649.

The defendants interpose the defense that the United States is not the proper party plaintiff, and, if so, the taxes cannot be recovered for the reason that the land was subject to taxation, and as the taxes were voluntarily paid, the doctrine of estoppel applies.

 · The government has never terminated its wardship over the Indians involved in these actions, and under the treaty the lands are held by the government in trust for the use and benefit of the wards with the tax-free provision until otherwise provided by law and until they are by fee-simple deeds transferred to the Indians. Title 25 U.S.C.A. § 348. It is not only a proper party plaintiff, but its duty as long as the wardship over the Indians exist is to proceed to protect the Indians' land and assert their exemptions from taxation, if the circumstances warrant. Title 5 U.S.C.A. § 485; title 25 U.S.C.A. § 231. The doctrine that it is the policy of the government as guardian of the Indians to protect them and their property, with authority to sue, was upheld in Cramer v. United States, 261 U.S. 219–232, 43 S.Ct. 342, 345, 67 L.Ed. 622, where the court said: "The contention that the United States was without authority to maintain the suit in the capacity of guardian for these Indians is without merit. In United States v. Kagama, 118 U.S. 375, 383, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228, the general doctrine was laid down by this court that the Indian tribes are wards of the nation, communities dependent on the United States. 'From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power.' This duty of protection and power extend to individual Indians, even though they may have become citizens. United States v. Nice, 241 U.S. 591, 598, 36 S.Ct. 696, 60 L.Ed. 1192, and cases cited; Heckman v. United States, 224 U.S. 413, 436, 32 S.Ct. 424, 56 L.Ed. 820; United States v. Gray, 201 F. 291 * * *; United States v. Fitzgerald, 201 F. 295 * * *. In United States v. Gray, supra, the capacity of the United States to sue for the breach of a lease made by an Indian allottee was asserted and upheld. After pointing out the fact that it was the policy of the government to protect all Indians and their property and to teach and persuade them to aban-

don their nomadic habits the court said: 'The civil and political status of the Indian does not condition the power of the government to protect their property or to instruct them. Their admission to citizenship does not deprive the United States of its power nor relieve it of its duty. * * *' In United States v. Fitzgerald, supra, it was held that the United States had capacity to sue for the taking of personal property from an Indian held by him subject to the management of an Indian agent, on the ground, among others, that such taking obstructs the execution of its governmental policy. At page 296 of 201 F., * * * the court said: 'The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies. It may maintain such suits, although it has no pecuniary interest in the subject-matter thereof, for the purpose of protecting and enforcing its governmental rights and to aid in the execution of its governmental policies.' Congress may, if it thinks fit, emancipate the Indians from their wardship wholly or partially, United States v. Waller, 243 U.S. 452, 459, 37 S. Ct. 430, 61 L.Ed. 843; but in respect of the Indians here concerned that has not been done. It results, from the conclusion we have reached to the effect that these Indians had occupied the lands in dispute with the implied consent of the United States and in accordance with its policy, that the United States sustains such a relation to the subject matter and persons that its authority to maintain the suit cannot be questioned."

■ The trust patent to Annie Luke having not expired nor was there issued to her a fee-simple patent, and the lands allotted to her being held in trust by the United States, it seems, without doubt, that the United States may maintain the action to recover back taxes paid by her upon her lands if exempt from taxation under the treaty, even though there is an administrator. appointed to administer her estate, because her property was held in trust by the United States. The doctrine of estoppel invoked because of the acts of an agency of the government in informing the county assessor that the lands were not held in trust by the government, and were therefore placed on the tax roll by mistake and the taxes voluntarily paid, is without mer-

it, as the United States is not bound or estopped by the acts of its agents in doing what the law does not sanction or permit. Utah Power & Light Company v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; United States v. Carbon County Land Co. et al. (C.C.A.) 46 F.(2d) 980, 987. Neither does the fact that the taxes were paid without protest by the Indian preclude a recovery by the United States. United States v. Dewey County (D.C.) 14 F.(2d) 784.

■ The argument that in these cases Congress had no authority to extend and continue the trust period falls, when we consider that as long as the tribal relation exists the national guardianship continues and includes the authority of the United States to make regulations and limitations upon the rights which such Indians might exercise in respect to their lands. Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L. Ed. 591.

As the assessment and levy of the taxes, by the county, against the land of the allottee Annie Luke, was illegal under the provisions of the treaty, the taxes paid by her are to be refunded to the United States to be held by it in trust for her use and benefit, and therefore the motion of the defendants for a nonsuit will be denied, and the objections of the defendants to the introduction of certain evidence is to be denied as it becomes pertinent to consider that evidence after the view taken by the court in these cases.

A decree will be entered as prayed for in plaintiff's complaint.

■ In case 1274, the United States seeks to quiet title to certain lands and clear the title from assessment of taxes, and recover the amount of taxes paid by Cable Carter, an Indian ward of the United States, for the years 1923 to 1928, inclusive. It is urged by the defendants that the United States should not recover as a patent in fee was issued by it to Carter on May 31, 1921, to the lands assessed, which is, and was at the time the taxes were levied, in force and effect, for the reasons: First, that Carter consented to the issuance of the patent in fee. Second, that by reason of the issuance of the patent in fee, the trust period expired prior to the cancellation of the patent by the Secretary of the Interior under date April 20, 1932, and therefore his order was of no force or effect. And, third, that the

tax lien and tax deed of the county gave it a vested right in the lands which could not be terminated without due process of law.

The lands in question were allotted to John Carter, William Carter, and May Carter, and thereafter, in December, 1897, trust patents were issued to them by the United States and in which the lands were to be held by the United States in trust for the allottees and their heirs for a period of twenty-five years, and at the end of which period, unless extended by order of the president, the fee-simple title would be conveyed to them. Thereafter, in August, 1919, the original allottees having died, Julia Carter, Jess Davis, and Esther Davis, who were some of the heirs, filed with the Commissioner of Indian affairs their petition for partition of the Indian lands. Cable Carter did not sign the petition for partition, but he secured the service of Congressman Carter of Oklahoma to intercede in his behalf, and as a result the commissioner determined that three of the heirs should have patent for their inheritance by reason of their competency, and Cable Carter was one of them. The land involved was then distributed and the fee patent issued to him on May 31, 1921. The authority to issue the patent was granted to the secretary under section 349, title 25 U.S.C.A. which provides: "that the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple." In February, 1927 (44 Stat. 1247 [25 U.S.C.A. § 352a]), Congress passed an amended act which provides: "The Secretary of the Interior is hereby authorized, in his discretion, to cancel any patent in fee simple issued to an Indian allottee or to his heirs before the end of the period of trust described in the original or trust patent issued to such allottee, or before the expiration of any extension of such period of trust by the President, where such patent in fee simple was issued without the consent or an application therefor by the allottee or by his heirs: Provided, That the patentee has not mortgaged or sold any part of the land described in such patent: Provided also, That upon cancellation of such patent in fee simple the land shall have the same status as though such fee patent had never been issued." It will be observed that section 352a limits the authority of the secretary to a cancellation of the patent when they were issued without the consent or an application therefor by the allottee or his heirs, and therefore the secretary would not have authority to cancel the patent unless the original patent was issued without the consent or an application therefor by the allottee or his heirs.

We then turn to the evidence to ascertain if Carter consented or applied for the issuance of the fee-simple patent, in order to determine if the secretary was authorized to cancel the same on April 20, 1932. The facts in relation thereto seem to be undisputed, and it appears that Carter did not sign any application or orally apply to the government for the issuance of the fee-simple patent, as all that was done by him was that he corresponded with Congressman Carter of Oklahoma to assist him in the issuance of a patent, the kind of which he did not refer to. Nothing appears as to what the Congressman did. Carter further testified that he didn't consent or make application to the government for the patent, nor participate in the partitioning proceeding, of the land, and that shortly after the patent was issued he wrote letters to the department and the superintendent stating that he didn't consent to the issuance of patent to him and complained about it. He says he paid taxes from 1921 to 1927, when they went delinquent, because he thought nothing could be done about it. In his affidavit for revocation of the patent, he states that in the year 1920 a commission was sent to Lapwai, Idaho, by the Interior Department to determine the competency of the Nez Perce Indians, and that he refused to appear before it. He further states in his affidavit that in his letter to Congressman Carter he did not intimate in any way that he desired to have a fee-simple patent granted to him, but what he did desire was that the partition of the inheritance be speedily disposed of by the department, and insisted that patent be issued to him for his share of the inheritance, meaning thereby that he desired a trust patent. In substance this is the evidence relating to consent or application for patent by Carter, unless the acts of Carter, after patent was issued, as to the land being partitioned, paying the taxes until 1927, and leasing and collecting the rent therefor, amount to a ratification of the issuance of the patent and are retroactive in effect. The statute is clear that the consent and application must precede actual issuance of

patent, and such consent must be positive and certain. The evidence does not meet this requirement, or that Carter made application for a fee-simple patent.

The periods relating to the trust period and the cancellation of the fee patent appears to be that on December 1, 1897, the trust period was for twenty-five years. On March 24, 1920, the President, having authority to do so, by order extended the trust period for ten years; on March 18, 1930, it was again extended by order of the President for ten years; and on June 18, 1934, Congress by an act extended it indefinitely. Title 25 U.S.C.A. § 462. The cancellation of the fee-simple patent to Carter being on April 20, 1932, it was therefore during the period when the trust period was alive, and authorized under section 352a, and when the patent in fee simple was issued without the consent or application of Carter. The expression "until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale," in the treaty, leaves to Congress authority to continue or remove the restriction of the lands being exempt from taxation. Congress being vested with that authority under the treaty did on February 26, 1927, 44 Stat. 1247 (25 U.S.C.A. § 352a), provide that where the patent in fee simple is issued without the consent or application of the allottee, the secretary may cancel the same, and the land shall have the same status as though such fee-simple patent had never been issued. We cannot indulge in the presumption that Carter gave his consent or made application for the fee-simple patent in a proceedings where it appears by his undisputed testimony that he did not.

By section 349, which was adopted May 8, 1906, Congress acting under authority granted by the treaty, providing, "until otherwise provided by law," removed the restriction as to exemption from taxation. The land was not restored to a trust patent status after the issuance of the fee-simple patent until the order of cancellation of the fee-simple patent on April 20, 1932, and all taxes levied between the date of the issuance of the fee-simple patent and order of cancellation are valid and enforceable against the land as the fee-simple title was in Carter and the land was subject to taxation under section 349, and all taxes levied thereafter are invalid and nonenforceable against the land as it had been restored to a trust status which exempted it from taxation during the trust period, under the treaty. United States v. Benewah County (C.C.A.) 290 F. 628; Gowdy v. Meath, 203 U.S. 146, 27 S.Ct. 48, 51 L. Ed. 130.

■ In view of the conclusion reached as to the land being subject to the taxes during the period that the fee-simple patent was in existence and not during the period it was held in trust by the United States, it may not become necessary to discuss the other contentions of the defendants as to the allottee's exercising supervision over their land or that the doctrine of acquiring property by an innocent purchaser and estoppel apply, or that because the county has paid over to the other taxing units of the state a portion of the amount of the taxes collected from the allottees, it should be relieved of responsibility of responding to the allottees. However, as these contentions are urged, it is sufficient to say again that such acts of the allottee would not breathe legality into the tax whether levied during the period that the fee-simple patents were in existence or when the lands were held in trust by the United States. United States v. Dewey County, supra; Ward v. Board of County Com'rs of Love County, 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751; Utah Power & Light Company v. United States, supra.

The views thus expressed, and the necessity of considering the evidence of the defendant, require the overruling of the motion for a nonsuit and the objections to the introduction of certain testimony of plaintiff, but a decree will be entered in favor of the defendants, sustaining the taxes levied during the period that the fee-simple patent was in existence and the tax deed issued thereon for delinquent taxes for the year 1927.

In case 1275, an action is brought by the United States to recover moneys paid by Alice Mattuge, an Indian ward of the United States, as taxes paid to the county and the cancellation of taxes levied during the period between the issuance and cancellation of the fee-simple patent. On June 13, 1895, there was issued to Alice Mattuge a trust patent for the lands in question and which the United States held in trust for twenty-five years; thereafter on November 20, 1919, there was issued to her a patent in fee for the lands, on October 20, 1920. The lands covered by the patent were assessed by the county and taxes levied and collected by it for

the years 1920 to 1925, inclusive, in the sum of $154.78, and were also assessed for the years 1926 to 1930, inclusive. On March 24, 1920, the trust period was extended for ten years, and thereafter on March 18, 1930, extended for another ten years by Executive Order. On February 26, 1927, Congress passed the cancellation act, title 25 U.S.C.A. § 352a, and under that act on July 16, 1930, the patent in fee simple issued to Alice Mattuge was canceled by the Secretary of the Interior. Thereafter, on July 18, 1934, the trust period was indefinitely extended by Congress, title 25 U.S.C.A. § 462. During the period from the issuance of the patent and its cancellation, Alice Mattuge did not convey or mortgage the property. No evidence appears that she either consented or made application for the patent. The only evidence in that regard was that of the superintendent of the Nez Perce Indians, that there was not of record any application made·by her.

At the conclusion of the introduction of plaintiff's testimony, the defendant moved to strike Plaintiff's Exhibits 2, 3, and 6, which relate to the extension of the trust period and the amount of taxes levied and paid, and for a dismissal of the action, no evidence was offered by the defendants.

In view of the interpretation of the treaty and provisions of the federal statutes made in the other two cases as to their application and effect, it becomes unnecessary to repeat what was said there, when in applying it to this case, only referring to the evidence and applying it to those conclusions reached.

Alice Mattuge, an allottee, was granted a fee-simple title to her lands on November 20, 1919. On July 16, 1930, it was canceled by order of the Secretary of Interior. Between those dates she was regarded by the United States to be competent to possess, manage, and control her property, and which was done by her. Her land was not restored to a trust status until the order of cancellation on July 16, 1930, and from that time on, her land was not subject to taxation, but was between the date of the issuance of the fee-simple patent to her on November 20, 1919, until July 16, 1930, the date of cancellation.

■ The contention of the United States that because the Cancellation Act of February 26, 1927, provides that upon cancellation of the patent in fee simple the land shall have the same status as though the patent had not been issued, and therefore it is retroactive in effect, cannot be accepted as the correct interpretation of it under the record when we come to consider the general rule of construction, that statutes are to be considered as prospective only, unless the language employed conclusively negatives that construction and the intention of the Legislature is clear and that they do not disturb vested rights. 59 C.J. 1170, 1171. Under the evidence the county has levied these taxes after the fee-simple patents were placed upon the public records of the county and after that was done, the lands, under section 349, were subject to taxation. After making its assessments of lands on which it figured the amounts of its levy necessary to run the county, it payed to the different municipal units their proportion of the taxes so levied and collected. Should the act be construed to be retroactive, the county would have to pay those amounts thereof already paid by it to the different municipal units, a liability that was not imposed upon it at the time the taxes were levied and paid to the municipal units, which would come under the well-established rule that: "A statute will not be given a retroactive construction by which it will impose liability not existing at the time of its passage." 59 C.J. 1172, 1173. Therefore, it would be manifestly unjust to give this cancellation statute a retroactive effect.

■ The further contention of the United States, that the correct interpretation of the treaty is that the exemption of the Indian's land is based upon treaty rights which is not affected by an act of Congress or the issuance of a patent in fee, and the issuance of the fee patent merely gave to the Indian the right to alienate his property, but did not cancel the right to hold it free from taxation. The difficulty in placing this construction on the treaty arises from a reading of it where it is said there, *"until otherwise provided by law,* such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee."* Whatever contractual rights, or to their land being exempt from taxation, their continuation was left to Congress by the treaty where it is provided, *"until otherwise provided by law,"* the tracts of land shall be exempt from taxation. Both the exemption from taxation and the aliena-

tion of the lands are subject *"until otherwise provided by law."* So Congress acting authoritatively under the treaty did on May 8, 1906, when it adopted section 349, remove the restriction as to exemption from taxation the Indian's land after a fee-simple patent had been issued to them. It would seem that no other construction than this can be given to the provisions of the treaty. While authorities are cited by the United States to the effect that there is a difference between the restrictions as to alienation and taxation referred to in the treaty, it will be observed from a reading of them that they were cases where the Indian's lands were still held in trust by the United States, and not after the issuance of a fee-simple patent. This distinction is apparent from those authorities. In view of the conclusion reached in this case, the motion for nonsuit is denied and motion to strike Exhibits 2, 3, and 6 of plaintiff's, but a decree will be entered in favor of· the defendant county, for the taxes during the period the .fee-simple patent was in existence and not during the trust period, after the cancellation of the patent.

Counsel for the defendants will prepare appropriate findings and decrees in each case in accordance with the views here expressed and to the following effect:

In case 1265: That Annie Luke's land, being trust land at all times the assessments and levies of taxes were made, is not assessable for taxes, and that all such taxes so assessed are illegal and set aside, and all taxes paid by her are to be refunded to the United States to be held in trust for her, and defendant's motion for nonsuit is denied.

In case 1274: That the motion for nonsuit be denied and the annulling of the tax deed issued to the county is denied, and all taxes paid by him prior to the order of cancellation are legal and to be retained by the county.

In case 1275: That the motion for a nonsuit is denied, as the land was not subject to taxation after the order of cancellation on July 18, 1930, but all taxes paid and remaining unpaid between the date of the issuance of the fee-simple patent on October 20, 1920, and the date of its cancellation on July 16, 1930, are legal and the county has the right to collect the same.

Each party to pay their own costs.