**ARENAS v. UNITED STATES.**

**No. 1321 O'C. Civil.**

District Court, S. D. California, Central Division.

April 25, 1945.

John W. Preston, Oliver O. Clark, David D. Sallee, Benson L. Smith, and Robert A. Smith, all of Los Angeles, Cal., for plaintiff.

Eugene D. Williams and James A. Murray, Sp. Assts. to Atty. Gen., and Marvin J. Sonosky, Atty., Department of Justice, of Washington, D. C., for the defendant.

J. F. T. O'CONNOR, District Judge.

*Contemporary litigation:*

This is an action by Lee Arenas, a citizen of the United States and of the State of California,[1] who is likewise a full blooded Mission Indian, of age, regularly enrolled and a registered member of the Agua Caliente or Palm Springs Band of Mission Indians of California and who, during all of his life, has been a resident upon the said Reservation, against the United States of America. He contends that he is entitled to a Trust Patent to certain lands in the Palm Springs Reservation in his own right, and also to trust patents as an heir at law and next of kin of his deceased wife, Guadaloupe Arenas; of his deceased father, Francisco Arenas; and of his deceased brother, Simon Arenas. As the dates the deceased Indians died are important, it will be stated, in limine, that Guadaloupe Arenas died March 26, 1937; that Francisco Arenas died October 4, 1924; and that Simon Arenas died February 18, 1925.

The action is brought under the Act of August 15, 1894, 25 U.S.C.A. § 345 (31 Stat. 760), which authorizes "all per-

[1] In 1924 Congress conferred citizenship upon all non-citizen Indians born within the United States. 43 Stat. (1924) 253.

sons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress * * * may commence and prosecute or defend any action * * *." The controversy is one of long standing and involves the legal effect of certain schedules of allotments of 1923 and 1927, respectively, selected by special allotting agent H. E. Wadsworth, the former of which was rejected by the plaintiff and others in 1923, and the latter of which was acquiesced in by the plaintiff and others in 1927; the legal effect of certificates issued and accepted or not accepted; the right of deceased Indians; the power of the Secretary of the Interior to approve and disapprove schedules of allotment, to issue and to refuse to issue allotment certificates and trust patents; that of heirship among Indians, and the efficacy of subsequent statutes to vitiate prior vested rights of the Indians.

To give a background to prior litigation in this and the other contemporary companion suit, a few pertinent facts should be stated. On May 8, 1936, eighteen Indians joined in one action in this court against the United States, all members of the same Band as Lee Arenas, the plaintiff in this action, to compel the issuance of Trust Patents to land in the Palm Springs Indian Reservation. These eighteen suits covered all but eleven of the selectees listed on the 1927 schedule as more fully described hereafter. The action was known as St. Marie et al. v. United States. Judgment was entered against the plaintiffs and in favor of the United States (D.C., 24 F.Supp. 237), and was affirmed, 9 Cir., 1940, 108 F.2d 876. The Supreme Court of the United States denied certiorari on October 14, 1940, for the reason that the petition therefor was filed too late. 311 U.S. 652, 61 S.Ct. 35, 85 L.Ed. 417.

Lee Arenas filed this instant action on December 24, 1940. The attorneys for the plaintiff and the government stipulated in open court that the District Court was bound by the decision of the 9th Circuit Court of Appeals in the St. Marie case, supra, and judgment was entered in favor of the government. This action was appealed to the Circuit Court of Appeals for the Ninth Circuit, and the District Court's ruling was affirmed in Arenas v. United States, 9 Cir., 137 F.2d 199, the Circuit Court following its decision in the said St. Marie case under the doctrine of stare decisis.

The Supreme Court of the United States granted certiorari on December 20, 1943, in this, the Lee Arenas case (320 U.S. 733, 64 S.Ct. 368, 88 L.Ed. 433) and on May 22, 1944, reversed the decision of the Circuit Court of Appeals in 9 Cir., 137 F.2d 199, and remanded the case for further proceedings. 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363. The several opinions written contain most of the facts and the applicable statutes. See opinion by Circuit Judge Haney, and dissenting opinion by Circuit Judge Garrecht in the St. Marie case, supra, which cover approximately twenty pages. Associate Jackson's opinion, speaking for the Supreme Court, covers twenty pages in Lee Arenas v. United States, 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363, argued March 6 and 7, 1944, and decided May 22, 1944. The length of the opinions, and the careful consideration given to the subject, indicate the importance the Circuit and Supreme Courts attached to the questions involved.

*Facts in the instant case:*

Upon the reversal of this, the Lee Arenas, case in the Supreme Court, counsel for the plaintiff filed a third amended complaint, to which there was an answer, a pre-trial hearing, a trial on the merits, and an order of court taking the case under submission on briefs, which briefs have been duly considered by the court. Counsel for the plaintiff allege, inter alia, that the Secretary of the Department of the Interior of the United States, acting under the authority of the Act of Congress of January 12, 1891, 26 Stat.L. 712-714, as amended June 25, 1910, 36 Stat.L. 855–863, and March 2, 1917, 39 Stat.L. 976, did, on or about the 7th day of June, 1921, conclude and determine that, in his opinion, the aforesaid Mission Indians of California were so far advanced in civilization as to be capable of owning and managing land in severalty. Preliminarily, as this is an important predicate for the cause of action, the court must assume this allegation to be true in view of the fact that it has not been successfully controverted by proof offered by the Government.

Historically, in order that the Palm Springs or Agua Caliente Band of Mis-

sion Indians should have land allotted to them in severalty, Secretary Lane, in 1916, called the neglect to the attention of Congress and asked that he be authorized to make allotments in amounts controlled by the General Allotment Act of 1887, General allotment Act of 1887, 24 Stat. 388, as amended by Sec. 17 of the Act of June 25, 1910, 36 Stat. 859, 25 U.S.C.A. § 331, instead of in those set out in the Mission Act of 1891, supra. Thereupon Congress passed the Act of March 2, 1917, 39 Stat.L. 969, 976, by which it directed the Secretary to proceed under the Act of 1910.

It has been stipulated, and therefore taken to be a fact, that the Secretary of the Department of the Interior did, on or about the 7th day of June, 1921, appoint one H. E. Wadsworth as Special United States Allotting Agent at Large for the Mission Indians Reservations of California; and acting pursuant to said authority, the said Special Allotting Agent was duly authorized to prepare a schedule of selections for allotments on the Mission Indian Reservations including the Palm Springs Indian Reservation, and that he surveyed and classified, or caused to be surveyed and classified, the lands of the Palm Springs or Agua Caliente Reservation of Mission Indians of California in order that allotments thereof in severalty should be made by said Special Allotting Agent to the members of the said Band of Mission Indians in accordance with the Statutes of the United States. Special Allotting Agent, H. E. Wadsworth, by letter dated January 7, 1923, sent the classification and appraisement schedules of the lands of this reservation to the Commissioner of Indian Affairs, Washington, D. C. (Court's Exhibit No. 7.)

In due course H. E. Wadsworth received a letter from the Commissioner of Indian Affairs, dated March 27, 1923, reading, inter alia, as follows:

"Reference is made to your letter of March 12, 1923, relative to allotting the lands of the Agua Caliente or Palm Springs Reservation wherein you invite the attention of the office also to the suggestions contained in your letter of January 7, 1923.

"The office has no objection to your making the allotments on that reservation at this time, before the hot weather comes on, and the general instructions contained in office letter of November 20, 1922, will be your authority and guidance in the matter. The necessary arrangements will be made with the General Land Office for the services of a surveyor in connection therewith.

"You may begin the allotting at Agua Caliente or Palm Springs as soon as the progress of your work will permit, and it is suggested that you confer with Supervisor Ellis in the matter and also carefully explain the proposed plan to the surveyor.

"Sincerely yours
    "(Sgd)   Chas. H. Burke,
          "Commissioner."

(Court's Exhibit No. 8.)

These Indians on this Reservation, upon learning that allotments were going to be given to them, for one reason or another, did not consider that it would be to their advantage to become allottees, and while the court does not know how many dissenters there were out of a total of fifty prospective allottees, twenty-six members of the Palm Springs Indian Band, including Lee Arenas, Guadaloupe Arenas and Simon Arenas, wrote a letter dated May 1st, 1923, to the Secretary of the Interior, setting forth their reasons for not wanting Government allotments[2] This letter was introduced at the trial as Defendant's Exhibit D, and, in view of the Indians' attitude

---

[2] Agua Caliente Indian Reservation, Palm Springs, California, May 1, 1923. To the Secretary of the Interior, Washington, D. C.

We ask you to take away these allotment surveyors until we can find it out just what they are going to do. Nobody notified us they were coming. The Agent Mr. Ellis cannot tell us what becomes of all our land.

The Indians never signed any agreement or made any petition for allotment. If any paper with a list of our States was sent it is not right. Agent put down our names without we knowing it or what it is for. Our tribe is whole against allotment.

We have patent for our land and we do not want it be taken away without our consent. We want to keep it whole.

The reason we dont want allotment is because our land is desert land and there is not enough good farming land for everybody forty acres. If the land is allotted then there is no grazing land left and could not keep cattle. We have to keep cattle to help make living. Even our best water years would not irrigate forty acres apiece. Now we can use what water we have on as much land as it will do for and have our other land for cattle. Then we can do nicely and decide everything for ourselves inside

regarding their prospective allotments reflected therein, and of the Government's insistence that they have their allotment certificates notwithstanding, it is set forth in this opinion in extenso. From Defendant's Ex. E,[3] the telegram to the Secretary of the Interior, dated May 1, 1923, we have a further exemplification of the Indians' attitude relative to their opposition to receiving allotments in severalty.

Special Allotting Agent, H. E. Wadsworth, on or about June 21, 1923, evidently being of the opinion that the Indians' likes and dislikes had nothing to do with their receiving their allotments, and that they would be thrust upon them regardless of their wishes in the matter, concluded the preparation of a schedule of selections for allotment containing the names of all enrolled members of the Palm Springs Indian Band, totalling fifty allottees, and a description of the land designated as the selection of each of those members; prepared instruments each entitled "Selection for Allotment" for each of the Indians listed on the 1923 schedule including Lee Arenas, Guadaloupe Arenas, Francisco Arenas and Simon Arenas, each instrument stating "not valid unless approved by the Secretary of the Interior," whereby each of the said allottees was to be allotted forty-seven acres, comprising a two acre homesite, five acres of irrigated land, and forty acres of desert land, as shown by the special allotting agent's schedule of June 21, 1923 (Court's Exhibit No. 15), said lands being a part of the Palm Springs Mission Indian Reservation in Riverside County, California. The court does not know how many of the fifty allottees refused their allotment certificates, but at least twenty-four refused them because their names appeared on the 1927 allotment schedule to be discussed later.

Agent H. E. Wadsworth transmitted by mail the "selection for allotment" for Lee Arenas and the "selection for allotment" for Guadaloupe Arenas, plaintiff's then wife (now deceased), to Lee Arenas, and the "selection for allotment" for Simon Arenas to Simon Arenas; and Lee Arenas and Simon Arenas both refused to accept the letters enclosing their selections for allotment, and the letters were returned to Mr. Wadsworth. Francisco Arenas did not accept his certificate of allotment, and these four allotment certificates remained in the possession of Mr. Wadsworth until he retired from the Government service in 1930.

By letter dated June 21, 1923 (Court's Exhibit No. 13), to the Commissioner of Indian Affairs, in reply to the Commissioner's letter of March 27, 1923 (Court's Exhibit No. 8), a portion of which is set out on page 6 of this opinion, [60 F.Supp. 414] Mr. Wadsworth informed the Commissioner of Indian Affairs that, in accordance with instructions contained in his letter of March 27, 1923, he had completed the work of al-

---

our own land if the government will give us a fair chance.

Agent Ellis says after allotment the government will make us citizens. Best the government give us citizenship first if they want to do it, then we know how to act on it and can do everything right. If our land is taken away first then it is lost and we have no show to fight for it. We ask make us citizens with all our land then we can do with it ourselves like we like to.

We are hearing that after this land allotted, a piece by Palm Springs would be set out for a townsite. Agent Ellis told us just now that ten acres around our hot spring will be set aside. We dont know what for. We dont like this kind of proposition on our land. White people already sell the land they got away from us in Palm Springs for $1500 to $2000 a lot. They want to push us away and get more our land cheap to sell like this.

We want to find it out all about these things before surveyors do anything. We dont know where will be our forty acres, near water or out in desert. We dont know what becomes of other thousand acres of our land. If it is sold we want to sell it. Other times people said money will be for developing water but Indians never got it. We want to know all these things so we ask it you send these surveyors away.

(Signed)     Captain.

(Signed by Pedro Chino Captain and twenty-five others) (Defendant's Ex. D.)

[3] Western Union Telegram, May 1, 1923.

Riverside, Calif.,

Secty of the Interior, Washington, D. C.

Surveyors came onto Agua Caliente Reservation Palm Springs for Allotment. Agent Ellis says Congress passed Bill to allot our lands. We not notified and dont want allotment. We have patent to our lands and want hold them always together. Please stop surveyors until we can find out something from you.

Pedro Chino, Captain Francisco Patencio, Lee Arenas.

(Deft. Exhibit E)

lotting the lands of the Agua Caliente (Palm Springs) Reservation and that the allotment schedules and maps (tracings) were transmitted therewith.

In this 1923 allotment schedule (Court's Exhibit No. 15) above referred to, filed with the Department of the Interior, he attached a certificate reading as follows:

"Palm Springs, Calif., June 21, 1923.

"This is to certify that listing of allotment selections for the Indians of the Agua Caliente (Palm Springs) Indian Reservation, California, began on June 1, 1923, and the same was completed on June 21, 1923; and it is further certified that the allotments shown hereon were made in accordance with the provisions of the Act of Congress of February 8, 1887 (24 Stat.L. 388), as amended by the Act of June 25, 1910, (36 Stat.L. 855) and supplemented by the Act of March 2, 1917 (39 Stat.L. 969-976)
          "H. E. Wadsworth,
               "Special Allotting Agent,
     "C. L. Ellis,
          "Superintendent Mission
               Indian Agency, California."

Mr. Wadsworth further stated in his letter of June 21, 1923, to the Commissioner of Indian Affairs, that he had found fifty individuals entitled to allotment on this reservation, each of whom received one lot of two acres, one five acre tract of good land under a water system already constructed and a forty acre tract of good land upon which water had not yet been developed, and he was particular to point out that "while most of these Indians refused to make a formal selection of lands desired by them for allotment, many sent word that they had entered into an agreement to oppose allotments, but that for me to go ahead and do the work, which would doubtless be satisfactory when completed" and that "I believe we have accomplished quite a satisfactory piece of work here, under the circumstances, and hope there will be no delay in securing approval of the same." (Court's Exhibit 13 [4]).

The General Land Office, it will be seen, recommended that the allotments, as reflected by the 1923 Schedule of Allotments, be approved; but the 1923 Schedule of Allotments does not appear to have been finally approved by the Secretary of the Interior and he refused to issue trust patents to which those four Indians claimed to have been entitled.

Progressing chronologically in the chain of events, pursuant to the recommendations of the Commissioner of Indian Affairs contained in a letter dated December 22nd, 1926, from the Commissioner to the Secre-

[4] Department of the Interior,
     United States Indian Field Service,
     Palm Springs, Calif., June 21, 1923.
Commissioner of Indian Affairs,
     Washington,
My dear Mr. Commissioner:

In accordance with instructions of the Office, contained in letter quoted above, dated March 27, 1923, I have completed the work of allotting the lands of the Agua Caliente (Palm Springs) Reservation, California, and the allotment schedules (duplicate) and maps (tracings) are transmitted herewith.

I found fifty individuals entitled to allotment on this reservation, each of whom received one lot of two acres in the addition platted to the existing townsite of the village of Palm Springs, one 5-acre tract of good land under the water system already constructed, and a 40-acre tract of good land, upon which water has not yet been developed. The plant for the townsite addition which was submitted to the office by me in my letter of January 7, 1923, was slightly changed by the engineer when the actual surveys were made in order to protect each Indian in as far as possible with reference to his improvements. I believe we have been able to accomplish this in practically every instance. In that same section (14), a reservation of ten acres was made for the hot spring, which will be available in case the Office decide at some time in the future to negotiate a lease for that valuable property. Supervising Engineer Clotts, with his assistant, visited the reservation at my request when we were laying out the 5-acre tracts under the water system, and this work is the result of his suggestions along that line.

While most of these Indians refused to make a formal selection of lands desired by them for allotment, many sent word that they had entered into an agreement to oppose allotments, but that for me to go ahead and do the work, which would doubtless be satisfactory when completed.

I believe we have accomplished quite a satisfactory piece of work here, under the circumstances, and hope there will be no delay in securing approval of the same.

                    Very respectfully,
                    H. E. Wadsworth,
                    Special Allotting Agent.

tary of the Interior and approved by the Secretary on January 5th, 1927, the Commissioner, by letter dated January 8th, 1927, advised Special Allotting Agent, H. E. Wadsworth, with respect to a schedule of selections for allotment on the Palm Springs Indian Reservation to include as selectees only those members of the Palm Springs Indian Band who consented in writing to receive an allotment; and, on March 19th, 1927, Lee Arenas and Guadaloupe Arenas requested that each be given allotments of land on the Palm Springs Indian Reservation.[5] Parenthetically, it should be remembered that, as of March 19, 1927, Francisco Arenas and Simon Arenas were both deceased; and that Guadaloupe Arenas died on March 26, 1937.

In accordance with instructions contained in the letter of January 8, 1927, from the Commissioner of Indian Affairs, and the letter of March 14, 1927, from the Commissioner of Indian Affairs, Special Allotting Agent, H. E. Wadsworth, on or about May 9, 1927, concluded the preparation of a schedule of selections for allotment containing the names of twenty-four Indians of the Palm Springs Indian Band, and a description of the land designated as the selection of each of those Indians, including Lee Arenas, Guadaloupe Arenas, Francisco Arenas and Simon Arenas; and the selections described for those four Indians were the same lands described in the schedule of 1923, and in the third amended complaint. On or about May 9, 1927, the plaintiff did issue and deliver to Lee Arenas a certificate of allotment for the land claimed by him under the 1927 allotment schedule, but it is not clear to the court if Lee Arenas accepted an allotment certificate for his then wife Guadaloupe Arenas (now deceased), or if she received her allotment certificate but lack of information thereof will not interfere with the opinion of the court.

Following the chain of events sequentially, by letter dated May 9, 1927, Special Allotting Agent, H. E. Wadsworth, informed the Commissioner of Indian Affairs that the 1927 schedule of selections for allotment was being transmitted in duplicate to the District Superintendent in Muskogee, Oklahoma, for the purpose of obtaining the endorsement of the District Superintendent, who forwarded the schedule in duplicate to the Commissioner of Indian Affairs in Washington, D. C., who received it in duplicate on May 25, 1927.

Thereafter, commencing in 1933, preliminary steps were taken which ultimately resulted in the enactment of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 25 U.S.C.A. § 461 et seq., under which the allotment in severalty of Indian tribal lands was forbidden providing a majority of the Indians on the Reservation did not vote against the application of the Act. A majority of the qualified voting members of the Palm Springs Indian Band voted against the Indian Reorganization Act. Pending the vote of the Indians under the Indian Reorganization Act, the 1927 schedule of selections for allotment remained in abeyance in the office of Indian Affairs.

In 1935, the Secretary of the Interior sought the solution of the Palm Springs Indian problem through legislation and pending the consideration of the matter by Congress, the 1927 schedule remained in abeyance in the office of the Indian Affairs. The 1927 schedule of selections for allotment for the first time since it was received in the office of Indian Affairs on May 25, 1927, was submitted by the Commissioner of Indian Affairs to the Secretary of the Interior for the Secretary's consideration and determination as to whether the 1927 schedule should be approved or disapproved.

On December 14, 1944, the Secretary of the Interior, through the Assistant Secretary of the Interior, after full study and consideration of the schedule and related matters, disapproved the 1927 schedule of selections for allotment of the Palm Springs Indian Reservation and the living selectees

---

[5] Department of the Interior,
  United States Indian Field Service,
  Palm Springs, Calif., March 19, 1927.
The Commissioner of Indian Affairs,
  Washington,
  Through H. E. Wadsworth, Special U. S. Allotting Agent.
Dear Sir:
  We, the undersigned Indians of the Palm Springs (Agua Caliente) Indian Reservation, in Riverside County, California, do respectfully request that we be given allotments of land of the said reservation, and that trust patents covering the same be issued to us as soon as practicable.
    Lee Arenas,
    Guadalupe Arenas
    (other signatures as well)
  Court's Exhibit 18)

and the probable heirs of deceased selectees listed on that schedule, including the plaintiff, were notified of the disapproval.

It must be borne in mind that from June of 1921, when H. E. Wadsworth was appointed Special United States Allotting Agent at Large for the Mission Indians Reservations of California, to December of 1944, when the 1927 schedule of selections for allotment was disapproved, that extensive correspondence had taken place among the Secretary of the Interior, the Commissioner of Indian Affairs and H. E. Wadsworth; and, while the foregoing historical narration of the facts is somewhat lengthy, it is, nevertheless, believed to be necessary as a factual background for a proper consideration of the case.

*Plaintiff's contentions:*

The plaintiff contends that at all times after the 21st day of June, 1923, he has been and now is the equitable owner of the lands in suit claimed by him and is entitled to allotment trust patent thereto and to the sole and exclusive possession and use and enjoyment thereof free and clear of all claims and demands of the defendant whatsoever; that by reason of the aforesaid acts of Congress, conduct, proceedings, statements and representations of the Secretary of the Interior and said Special Allotting Agent, H. E. Wadsworth, it became since the 21st day of June, 1923, the mandatory duty of the Secretary of the Interior to issue to plaintiff a trust patent to the above described lands. Plaintiff contends that the defendant is estopped to question or deny plaintiff's equitable title to the above described lands, or his right to an allotment trust patent thereto or his right to the sole and exclusive possession, use and enjoyment thereof.

Counsel have stipulated that Guadaloupe Arenas, Simon Arenas and Francisco Arenas, the deceased wife, brother and father, respectively, of the plaintiff were, during their lifetimes citizens of the United States and of the State of California, all of Indian blood and descent and duly enrolled and recognized members of the Palm Springs or Agua Caliente Band of Mission Indians, and the plaintiff claims that, as heir at law and next of kin of these three Indians, he is likewise entitled to trust patents to the lands which he contends they were likewise entitled to, and who, as he alleges, occupied the same status with respect to their lands as he does to his.

It is alleged in the third amended complaint, in substance, that Lee Arenas, Guadaloupe Arenas, Francisco Arenas and Simon Arenas, relying upon the statements of Special Allotting Agent, H. E. Wadsworth, on or about October 26, 1923, that the issuance and delivery of said certificates of allotment entitled them to enter upon and/or improve the lands allotted to them, and that the certificates of allotment were and would be evidence of the right of these Indians to possess and/or improve said lands pending the issuance of a trust patent therefor; and that, believing and relying upon the aforesaid statements and representations of said Special Allotting Agent, H. E. Wadsworth, they did remain, enter upon and/or improve their lands in varying amounts. The improvements made by Lee Arenas to his land will be discussed later in connection with the 1927 schedule of allotments.

*Principles of equitable jurisprudence applicable under the guardian and ward relationship where each Indian is non sui juris:*

If this were a suit in equity between private litigants dealing with each other at arm's length, where each party thereto was sui juris, in which the plaintiff was suing for specific performance to compel the defendants to accept the allotment certificates and the land covered thereby, and contended that their remaining, going upon, and/or cultivating the land, even though reluctantly, constituted an acceptance thereof, notwithstanding the fact that the allotment certificates had not been literally accepted and remained in the physical possession of the plaintiff, the court believes that a court of equity, incorporating the other relevant facts in this case into a hypothetical situation, would sustain the plaintiff's contention and decree specific performance, holding the defendants to have the equitable title to the land and looking upon the plaintiff as a constructive trustee of the legal title in trust for the defendants; and, e converso, if these Indians had instituted suit against the Government, assuming them again to be sui juris, to be relieved from accepting the land called for by the allotment certificates and had contended that they had never accepted them, the court would be compelled to say that their remaining, going upon and/or improving the land was an implied or constructive acceptance of their allotment certificates, and

they would not be permitted to prevail. Facta sunt potentiora verbis.

The court is satisfied that, from the time these allotment certificates were tendered to the four Indians under the 1923 allotment schedule, the offer was never withdrawn, actually or by implication, and that the Indians could have had the physical possession thereof at any time up until the allotment schedule of 1927 was prepared, which will be discussed later. Neither has it been brought to the court's attention that third parties, acting in good faith or otherwise have acquired intervening rights to the lands in question making it inequitable for this court to grant the prayer of the plaintiff for the lands in suit.

If this principle of equity would apply to individuals each of whom was sui juris, how infinitely stronger is the position of the Indians in this case claiming the land for reasons which will likewise be hereinafter explained. While the court concludes that there never had been a withdrawal of the tender of these allotment certificates under the 1923 allotment schedule on the part of the Government up until the time the allotment schedule of 1927 was prepared, and that the allotment certificates under the 1923 schedule of allotments, tendered to, but physically refused by the Indians, had been constructively accepted by the Indians in 1923, by reason of their remaining, going upon and/or improving their lands, this court is satisfied, as it sees the fundamental issues in this case, that the acceptance or rejection on the part of these Indians of their allotment certificates, constructively or in fact, is absolutely immaterial to the issues in this case for the reason that, under the guardian and ward relationship existing between the Government and these Indians, each Indian, as a matter of law, was non sui juris, and neither had the power of accepting nor rejecting them.

It must be borne in mind that this is an equitable suit bringing into play equitable doctrines, and that the Government is dealing with Indians under a guardian and ward relationship.[6] For upwards of a hundred years the United States Supreme Court has unequivocally, and many times with vehemence, set forth the positive duty of the United States toward its Indian wards. Cramer v. United States, 1923, 261 U.S. 219, 232, 43 S.Ct. 342, 67 L.Ed. 622; United States v. Kagama, 1886, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228; Fellows v. Blacksmith, 1856, 19 How. 366, 60 U.S. 366, 370, 15 L.Ed. 684; Worcester v. Georgia, 1832, 6 Pet. 515, 31 U.S. 515, 561, 595, 8 L.Ed. 483.

---

[6] "Incompetent persons, though citizens, may not have the full right to control their persons and property." Tiger v. Western Investment Co., 1911, 221 U.S. 286, 315, 31 S.Ct. 578, 586, 55 L.Ed. 738.

"The mere fact that citizenship has been conferred upon Indians does not necessarily end the right or duty of the United States to pass laws in their interest as a dependent people." Hallowell v. United States, 1911, 221 U.S. 317, 324, 31 S.Ct. 587, 589, 55 L.Ed. 750.

"Citizenship is not in itself an obstacle to the exercise by Congress of its power to enact laws for the benefit and protection of tribal Indians as a dependent people." United States v. Sandoval, 1913, 231 U.S. 28, 48, 34 S.Ct. 1, 6, 58 L.Ed. 107.

"The guardianship of the United States continues, notwithstanding the citizenship conferred upon the allottees." United States v. Noble, 1915, 237 U.S. 74, 79, 35 S.Ct. 532, 534, 59 L.Ed. 844.

"The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it." Winton v. Amos, 1921, 255 U.S. 373, 392, 41 S.Ct. 342, 349, 65 L.Ed. 684. See also United States v. Waller, 1917, 243 U.S. 452, 459; 37 S.Ct. 430, 61 L.Ed. 843; Williams v. Johnson, 1915, 239 U.S. 414, 421, 36 S.Ct. 150, 60 L.Ed. 358.

See United States v. Nice, 1916, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192, where it was also said: "Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians, or placing them beyond the reach of congressional regulations adopted for their protection." (241 U.S. 591, 598, 36 S.Ct. 696, 698, 60 L.Ed. 1192). "Congress may, if it thinks fit, emancipate the Indians from their wardship, wholly or partially, United States v. Waller, 243 U.S. 452, 459, 37 S.Ct. 430, 61 L.Ed. 843; but in respect of the Indians here concerned that has not been done." Cramer v. United States, 261 U.S. 219, 233, 43 S.Ct. 342, 346, 67 L.Ed. 622.

See also Calif. Law Rev. Vol. 14, p. 178.

According to these decisions, the Indian occupies a most favored status on account of his primitivity, his being first on this continent, and his present helplessness. Because of this condition, treaties and agreements to which the Indian is a party, and statutes affecting his status and his rights and privileges, are to be given a liberal interpretation.

" * * * in the government's dealings with the Indians * * *. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years * * *." (Choate v. Trapp, 1912, 224 U.S. 665, 675, 32 S. Ct. 565, 569, 56 L.Ed. 941. See also Starr v. Long Jim, 1913, 227 U.S. 613, 623, 33 S.Ct. 358, 57 L.Ed. 670; Jones v. Meehan, 1899, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49.

The foregoing equitable principles foundationing this suit in equity, with a guardian and ward relationship attaching thereto, are set out in order that there cannot be any misunderstanding about the equitable rules of jurisprudence that must be applied by this Chancellor to a solution of the problems involved herein; and the Government must be compelled to act toward its Indian wards not merely bona fide but cum uberrima fide.

As the court views the issues in this case, there is but one question of fact and three principles of law to be determined by the court, and they will be set out for a logical solution, as follows:

(1) Did the Indians fulfill all of the conditions exacted of them by the Acts of Congress as conditions precedent to entitle them to allotment certificates and trust patents;

(2) Was the issuance of allotment certificates and trust patents, on the part of the Secretary of the Interior, after the Indians had complied with all of the conditions precedent laid down by the Acts of Congress, mandatory and a ministerial act or purely discretionary and uncontrolled by Congress;

(3) Did the right of a deceased Indian to an allotment certificate and a trust patent to the land allotted to him descend to his heirs at law and next of kin;

(4) Will a subsequent act of Congress, or the Indian Reorganization Act of June 18th, 1934, 48 Stat. 984, 25 U.S.C.A. § 461, et seq., vitiate a vested right?

The answers to these questions should determine the correct solution to the problem in this case, and each question will now be taken up by the Chancellor and discussed separately.

*Indians had complied with all conditions precedent prescribed by the Acts of Congress entitling them to allotment certificates and trust patents under the 1923 allotment schedule.*

The Supreme Court of the United States in this case (322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363) in granting certiorari, reversing the Circuit Court of Appeals for the Ninth Circuit, and remanding the case to this court for a trial on the merits, was interested to learn what the facts would develop at the trial and stated, inter alia, 322 U.S. on page 425 et seq., 64 S.Ct. on page 1092, 88 L.Ed. 1363, relative to the Act of Congress of January 12, 1891, 26 Stat. L. 712-714:

"The Act of 1891 provides that 'whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, *in the opinion of the Secretary of the Interior,* be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians.' (Emphasis supplied.) This undoubtedly conferred a very considerable discretion upon the Secretary.

"The Act of 1917, however (39 Stat. 969-976), drops the language of discretion and *directs* the Secretary to cause allotments to be made to the Indians on the Mission reservations. The Act was prepared by the Secretary (See letter of Secretary of Interior to Chairman of Senate Committee on Indian Affairs, January 7, 1916) *and if it was intended to perpetuate his discretion as to whether the allotment policy was to be applied to these Indians at all, it might easily have so provided.* Both the Secretary and Congress appear to have settled that point. * * *

"*To assume that the Act of 1917, while directing the Secretary to make allotments, only meant to give him uncontrolled discretion not to do so would be a doubtful construction, in view of its history. But even if it were so interpreted, it did not require the Secretary to manifest his exercise of discretion in any formal way.* His opinion

that the Indians had the capacity for individual responsibility for land ownership could be indicated by conduct as well as by words. We think his conduct and words amount both to an administrative construction of the 1917 Act as a direction and to the exercise of any discretion he may have had under it.

"If the Indians were not ready for allotments, why send an agent to hold out to them that hope and promise? Why the elaborate procedure of allotment? The Department then sought not only to offer allotment but to proceed so as to make the Indians 'fall in line.' Despite the obvious inference from these acts the record does not counter them by any showing that the Secretary now considers these Indians to lack civilization and capacity, tested by the usual standards for allotment, nor does it show that they do not in fact possess it. History and common knowledge of these Indians would indicate that they are not wanting in whatever it is that makes up 'civilization'." (Italics supplied.)

The Supreme Court in Lee Arenas v. United States (supra) was also interested in knowing what the position of the Government was for the non-approval by the Secretary of the Interior of the 1923 schedule of allotments; and, apart from the fact that the majority of the Indians objected to their allotments under the 1923 allotment schedule, the Government on the trial of this case has not presented any satisfactory reason for said disapproval in this court, and took the position that the approval or disapproval thereof was purely discretionary with the Secretary of the Interior as a matter of law.

While the Circuit Court of Appeals, on the appeal prosecuted to it in this, the Lee Arenas, case, (9 Cir., 137 F.2d 199), found itself bound, under the doctrine of stare decisis, to follow its ruling in the St. Marie case (9 Cir., 108 F.2d 876) in which it held, inter alia, that it was discretionary with the Secretary of the Interior to either approve or disapprove allotment certificates leading to trust patents, under the 1917 statute, supra, and found for the Government; this court, while it is bound by the decisions of the Circuit Court of Appeals for the Ninth Circuit, is a fortiori bound by the later rulings of the Supreme Court in this case, and concludes therefrom that the Supreme Court has expressed its opinion (even though it may be denominated obiter dicta in view of the fact that it

was not actually adjudicating this point at that time) that, in a case squarely before it on that point, it would hold that under the 1917 Act, supra, the Secretary of the Interior does not have an uncontrolled discretion for approving allotment certificates and the issuance of trust patents as he had under Section 4 of the Act of January 12th, 1891, 26 Stat. 712. In remanding this case to this court for a trial on the merits the Supreme Court was interested in the facts of the case. These statutes will be discussed more in detail later, but at this point the court will permit the record to speak for itself on the status of these four Indians in 1923 when these allotment certificates were made out for them under the 1923 allotment schedule.

It must be remembered that this band of Mission Indians has resided since 1897 upon the Agua Caliente or Palm Springs Indian Reservation set aside for their occupancy and use by Congressional Decree, and pursuant to the Act of Congress enacted January 12, 1891, 26 Stat. 712 (opinion of Judge Yankwich, St. Marie v. United States, D.C., 24 F.Supp. 237, 258); and the evidence shows that these four Indians had been living on the land covered by the allotment certificates issued for, but not physically accepted by them, prior to May 1, 1923.

Harry E. Wadsworth, the Allotting Agent heretofore referred to, called as a witness for the plaintiff, testified at the trial on direct examination conducted by counsel for the plaintiff, as follows:

"Q. What year did you make the allotment work at Agua Caliente or on the Palm Springs Reservations? A. The first allotment we made in 1923.

"Q. What did you do to prepare for these allotments? A. The first duty, of course, was to consult all the Indians and tell them I was there for the purpose of making allotments in severalty and ask them to come in and make such selections as they wished, allotting it to them. * * *

"Q. How many Indians were entitled to allotment at that time? A. I think in preparing the first schedule in 1923 I found there were 51 Indians entitled to allotment; that is, 50 or 51; right near that number. * * *

"Q. What, if anything, did you do in 1923 in the way of assurances to allottees of their right to possess and enjoy the allotments made by you on the '23 Schedules—23 schedule? A. The question was

422

raised as to how soon an allottee could enter upon and use the allotment after he had made his selection. I put that question up to the Commissioner of Indian Affairs, and he authorized me to inform the allottees that they could go ahead and use the allotment as soon as the selections were completed and Schedule changed. * * *

"Q. Did you inform any of the allottees of this authority? A. I did * * *

"Q. What was your course of conduct with reference to the Palm Springs Reservation allottees under the 1923 Schedule with reference to taking possession and cultivating their allotments? A. I told them they could occupy the lands and make use of them as long as the allotments were scheduled out.

"Q. On this occasion the Schedule had already gone forward, had it not? * * * A. It had already gone in * * *

"Q. Did you know in his lifetime Francesco Arenas? A. I knew him.

"Q. And Simon Arenas? A. Yes.

"Q. Did you know whether or not—no, do you know whether or not they were living upon the land that you allotted under the '22 (1923) schedule, or not? A. My recollection of it is, they were.

"Q. What was your course of conduct with reference to the Indians? I am now speaking of the '23 schedule—who were in possession of their property? A. Our thought was to preserve to each family the land which they claimed as a home, first of all. And to allot * * * that family those lands which they had claimed and occupied as a home.

"Q. You called the '23 Schedule Allotment more or less an arbitrary one, did you not? A. Yes.

"Q. Was, or was it not, your custom—yes was it not your practice, in making that 1923 Schedule to award allotment to those in possession of the particular piece of property you allotted to them? A. Right. * * *

"Q. Was there any protest at any time as to whether or not Lee Arenas was entitled to an allotment? A. None.

"Q. Was he qualified? Did you find him qualified when you made out the 1927 and 1923 Schedule? A. He would not have been put on the Schedule if I had found anything the matter with his eligibility.

"Q. Did anything come to you from the Indian Office or the office of the Secretary in the way of objections or protests against Mr. Arenas? A. None.

"Q. Is the same statement true of Simon Arenas and Francesco Arenas? A. Yes, sir.

"Q. And Guadaloupe Arenas? A. Yes. * * *

"Q. Do you know whether Lee Arenas lived on his place at the time you made the allotment in 1923 and 1927? A. My recollection is, he did.

"Q. And his wife too? A. Yes."

On cross-examination, Harry E. Wadsworth testified as follows:

"Q. During the period from 1916 to 1921 you had occasion to go on the Palm Springs Indian Reservation? A. 1917 to 1921 I had Palm Springs in my jurisdiction.

"Q. And you had occasion to go on that Reservation? A. Oh, yes. * * *

"Q. Do you recall whether Lee Arenas had a structure on the Reservation? A. My recollection of it is, he had a structure, one of those places under the water system. * * *

"Q. Do you recall whether Francesco Arenas, Lee Arenas' father, had a place on the Reservation? A. I remember that he lived there but the nature of his house or his property I could not remember. * * *

"Q. Do you recall whether Simon Arenas had a place on Section 14? A. I cannot remember so well, but if it appears that way on the schedule that is where he lived, because it was his home, as I remember it, that was allotted to him.

"Q. Of course, Guadalupe Arenas, the wife of Lee Arenas, lived with Lee Arenas? A. Yes.

"Q. Now, at the time you came on the Reservation as Special Allotting Agent in 1923, had the status of the structures on the Reservation changed any? A. During what period?

"Q. From the period from 1916 up to the time you came on as Special Allotting Agent? A. No special change.

"Q. When you came on in 1923 Lee Arenas was still living in the same house? A. Yes.

"Q. On Section 26? With his wife, Guadalupe Arenas? A. Yes.

"Q. And Simon Arenas and Francesco Arenas each were in the same place. A. The same place.

"Q. Mr. Wadsworth, you testified that in selecting allotments—in selecting tracts in 1923 you endeavored to give each Indian the plot on which his house, or dwelling * * * was located? A. Yes.

"Q. You did that in the case of Lee Arenas? A. Yes.

"Q. And in the case of Simon and Francesco? A. Yes, especially in those cases because those were made arbitrarily in the first schedule and I was specially trying to protect them and their families in their home property because they would not make the selection themselves, I took some pains with them, more pains than with others."

Lee Arenas also took the stand and impressed the court as not lacking in intelligence and education, and he testified to the fact that he had lived at Palm Springs all his life, his relationship as an heir at law and next of kin of Guadaloupe Arenas, Francisco Arenas and Simon Arenas, the value of structures on the properties in question and that he claimed the same; also that the reason he refused the allotment in 1923 was because he had been misled by the Indian Federation and that he now desired it. Not once did H. E. Wadsworth take the position that anything remained to be done on the part of the Indians to receive their allotment certificates; in fact the entire record shows that he considered it his duty to compel them to take their allotment certificates, even against their will.

Bearing in mind that each Indian was non sui juris and a ward of the Government, it is difficult for the court to understand what remained for them to do to entitle them to their trust patents, being like flotsam and jetsam rising and falling involuntarily with the tide of National congressional legislation and managed and controlled without their personal wishes being taken into consideration so far as legislative acts of Congress were concerned. As far as their ability to deal with the · Federal government was concerned, each Indian was civiliter mortuus and entirely subject to the Acts of Congress.

The court is clearly of the opinion that the Indians in this case, up until the decease of Francisco Arenas, the first of the Indians in this case to die on October 4, 1924, and of the other Indians up until the time of their deaths, did everything that was expected of them to ob-

tain trust patents to their lands, i. e., to the extent of which they were capable, in view of the guardian and ward relationship; and that the attitude of Mr. Wadsworth clearly indicated that, in his opinion, the equitable title to the land, as reflected by the allotment certificates, belonged to the Indians and that trust patents would be forthcoming in due course.

*Issuance of trust patents a ministerial act and mandatory when conditions precedent on the part of Indians had been fulfilled.*

It will be recalled that Secretary Lane had previously asked that he be authorized to make allotments in the instant case under the General allotment Act of 1887, Act of Feb. 8, 1887, 24 Stat. 388, as amended by Sec. 17 of the Act of June 25, 1910, 36 Stat. 859, 25 U.S.C.A. § 331 instead of under the Mission Act of 1891; and that thereupon Congress passed the Act of March 2, 1917, 39 Stat. 969, 976, by which it directed the Secretary to proceed under the Act of 1910, which was subject, of course, to the provisions of the Act of 1917, supra.

The Mission Indians Act of January 12, 1891, c. 65, 26 Stat. 712, under which Secretary Lane did not wish to proceed, authorized the creation of a commission to arrange a settlement of the Mission Indians upon reservations. The pertinent parts of this Act are as follows:

"Sec. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. * * *

"Sec. 3. That the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservations, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of

424

twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charge or incumbrance whatsoever. * * *

"Sec. 4. That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, *in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians,* out of the land of such reservation, in quantity as follows. * * *

"Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of California, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. * * *" (Italics supplied.)

The pertinent sections of the Act of February 8, 1887, 24 Stat. 388, under which Secretary Lane wished to proceed, as amended by Section 17 of the Act of June 25th, 1910, 36 Stat. 859, 25 U.S.C.A. § 331, but, before the said amendment, read as follows:

"Sec. 2. That all allotments set apart under the provisions of this act shall be selected by the Indians, heads of families selecting for their minor children, and the agents shall select for each orphan child, * *. *. *Provided, That if any one entitled to an allotment shall fail to make a selection* within four years after the President shall direct that allotments may be made on a particular reservation, *the Secretary of the Interior may direct the agent of such tribe or band,* if such there be, and if there be no agent, then a special agent appointed for that purpose, *to make a selection*

*for such Indian,* which election shall be allotted as in cases where selections are made by the Indians, and patents shall issue in like manner.

"Sec. 3. That the allotments provided for in this act shall be made by special agents appointed by the President for such purpose, and the agents in charge of the respective reservations on which the allotments are directed to be made, *under such rules and regulations as the Secretary of the Interior may from time to time prescribe,* and shall be certified by such agents to the Commissioner of Indian Affairs, in duplicate, one copy to be retained in the Indian Office and the other to be transmitted to the Secretary of the Interior for his action, and to be deposited in the General Land Office. * * *

"Sec. 5. *That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor* in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. * * *" (Italics supplied.)

Section 17 of the Act of June 25, 1910, 36 Stat. 859, does not seem to have any materiality so far as the point under discussion is concerned, i. e., in deciding whether or not it was discretionary or mandatory on the part of the Secretary of the Interior to issue allotment trust patents; but Congress, instead of giving Secretary Lane the permission requested, controlled exclusively by these two statutes; in order to provide for a more effective disposition of the lands, inserted the following provision in the Appropriation Act of March 2, 1917, 39 Stat. 969, 976, which referred to the making of allotments on the Mission reservations: *"Provided, That the Secretary of the Interior be, and he is hereby, authorized and directed to cause allotments to be made* to the Indians belonging to and having tribal rights on

the Mission Indian Reservations in the State of California, in areas as provided in section seventeen of the Act of June 25th, 1910 (36 Stat. 859) *instead of as provided in section four of the act of January 12th, 1891* (26 Stat. 713)." The court is satisfied that this amendment removed the words in Section 4 of the Act of 1891 *"in the opinion of the Secretary of the Interior"* and instead he was *"authorized and directed to cause allotments to be made to the Indians."* (Italics supplied)

■ This language in the Act of March 2, 1917 *"That the Secretary of the Interior be, and he is hereby, authorized and directed to cause allotments to be made"* (italics supplied) certainly has a meaning; and, under the rule of statutory construction that a subsequent statute will repeal a prior statute in whole or in part, in direct conflict therewith by implication, is tantamount to a mandate to the Secretary of the Interior to approve the allotment certificates and issue trust patents in accordance therewith when the Indians had complied with the conditions precedent laid down by the several acts of Congress entitling them thereto. Ipso jure, these Indians became entitled to trust patents to their lands when they had fulfilled the conditions laid down by the Acts of Congress and they were not controlled by the arbitrary judgment of the Secretary of the Interior who was bound by the law to approve the issuance of the trust patents when the Indians had fulfilled the conditions of the Acts of Congress of August 15, 1894, 25 U.S.C.A. § 345, 31 Stat. 760; and, under the Act under which this suit is brought this court has the jurisdiction to determine if these conditions have been fulfilled.

See Henry Gas. Co. v. United States, 8 Cir., 191 F. 132, 139, where it is stated:

"It is true that the Secretary of the Interior may prescribe reasonable rules and regulations not inconsistent with, or contrary to, the law of Congress, under which allotments shall be made; but this does not authorize him to withhold an allotment altogether from one shown by the rolls to be entitled thereto." (Cases cited.)

The allotment schedule of 1923 had been completed and approved by the General Land Office (Court's Ex. 8 on page 6 of this opinion [60 F.Supp. 414]); the allotment certificates for the four Indians in suit had been tendered to and held in trust for them until the 1927 schedule of allotments was prepared, the Indians were authorized to remain on, enter and/or improve their lands; and nothing remained to be done except the ministerial function of approving their allotment certificates and issuing them their trust patents.

While it is exceedingly difficult, if not impossible, to fix any exact date upon which all four Indians in suit had complied with the conditions precedent entitling them to trust patents, the third amended complaint requests that they be issued and begin to run from June 21, 1923, under the 1923 Allotment Schedule, and as the court is satisfied that all four Indians who were living at that time had fulfilled all of the requirements therefor, it is the judgment of the Chancellor that on June 21, 1923, the four Indians in suit had acquired vested rights to their trust patents, as reflected by their allotment certificates, although not ministerially approved by the Secretary of the Interior.

*Right of deceased Indian descends to heir at law and next of kin:*

■ Does the right of a deceased Indian to an allotment certificate and a trust patent descend to his heirs at law and next of kin? Statutes providing for allotment do not ordinarily permit allotment and patent in the name of a deceased Indian. LaRoque v. United States, 239 U.S. 621, 36 S.Ct. 22, 60 L.Ed. 147, affirming 8 Cir., 198 F. 645, 117 C.C.A. 349. Statutes which provide for the contingency of the death of an Indian allottee before his deed become effective, and that in such case the land shall inure to and vest in his heirs (Perryman v. Woodward, 238 U.S. 148, 35 S.Ct. 830, 59 L.Ed. 1242, the effect of the Act of June 25, 1910, 36 Stat. 863, c. 431, Sec. 32, 25 U.S.C.A. § 353), assume the existence of a legal allottee and have no application where there never was such an allottee in existence (Iowa Land, etc., Co. v. United States, 8 Cir., 217 F. 11, 133 C.C.A. 121).

Section 5 of the Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 348, under which Secretary Lane had wished to and did proceed, as well as section 5 of the Act of January 12, 1891, 26 Stat. 712, both provide that upon the decease of an Indian to whom allotments have been made the land shall descend to his heirs.

" * * * a statute, providing that the issuance of a patent for public lands to a person who has died before the date of

the patent vests the patent in the heirs of the patentee as if the patent had issued to the deceased person during his life, has been held applicable not only to patents for public lands, see C.J.S. title Public Lands, § 193, also 50 C.J. p. 1099, note 73, but also to patents to Indian allottees who died after the selection of the allotment. U. S.—Larkin v. Paugh, Neb., 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640—U. S. v. Chase, Neb., 245 U.S. 89, 38 S.Ct. 24, 62 L.Ed. 168—Crews v. Burcham, Ill., 1 Black 352, 17 L.Ed. 91. The same rule is followed under similar statutes, expressly relating to Indians, which provide for the contingency of the death of an Indian allottee before his deed becomes effective, and that in such case the land shall inure to, and vest in, his heirs. U. S.—Perryman v. Woodward, Okl., 238 U.S. 148, 35 S.Ct. 830, 59 L.Ed. 1242. 31 C.J. 512, note 62." 42 C.J.S., Indians, § 51, p. 731.

See also United States v. Whitmire, 8 Cir., 236 F. 474, 480:

"When the right to a patent has once become vested under the law, it is equivalent, so far as the government is concerned, to a patent actually issued." (Cases cited.)

See also Smith v. Bonifer, C.C.Or., 132 F. 889, 891; also dissenting opinion of Garrecht, Circuit Judge, in St. Marie v. United States, 9 Cir., 108 F.2d 876, 881, 895.

The Chancellor accordingly will hold that Lee Arenas, in his own right, and as heir at law and next of kin of his deceased father, Francisco Arenas, his deceased brother, Simon Arenas, and his deceased wife, Guadaloupe Arenas, are entitled to trust patents under the 1923 allotment schedule running from June 21, 1923, the date the allotment certificates in suit were issued, for the period of twenty-five years under the Mission Indian Act of 1891, 26 Stat. 712.

*Subsequent acts of Congress cannot affect vested rights; and neither can the Secretary of the Interior withdraw from allotment lands which have been set apart by Congress for allotment to Indians:*

It is interesting to note, as commented on in the Lee Arenas case (322 U.S. 419, 433, 64 S.Ct. 1090, 88 L.Ed. 1363), that the Secretary of the Interior endeavored to persuade Congress in 1935 to enact a bill authorizing him to make a 99 year lease of the reservation lands (see H.R.Rep.No.1521 and Sen.Rep.No.1201, 74th Cong. 1st Sess.); and in 1937, the Secretary recommended to Congress the repeal of the provisions of the Act of March 2, 1917, directing the making of allotments on the Mission Indian Reservations, without success.

■ Subsequent Acts of Congress, or the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 25 U.S.C.A. § 461 et seq., cannot vitiate vested rights.

■ Heretofore, when acts have been passed which seek to modify allotment rights and privileges, these acts have been generally construed as not intended to apply where allotments had already been selected, nor to affect the trust patenting of these selections. So where an Indian had made a homestead entry (treated as analogous to allotment selections) under the Act of 1875 [43 U.S.C.A. § 189] and performed the conditions entitling him to a patent, the Act of 1884 [43 U.S.C.A. § 190] prescribing a 25 year trust patent instead of a fee patent was held not to apply to him. United States v. Hemmer, 241 U.S. 379, 36 S.Ct. 659, 60 L.Ed. 1055; United States v. Saunders, C.C.Wash., 1899, 96 F. 268. An Indian has greater rights in an allotment on a reservation than on public domain. Clark v. Benally, 51 L.D. 98.

■ The Secretary of the Interior cannot withdraw from allotment, lands which have been set apart by Congress for allotment to Indians (Leecy v. United States, 8 Cir., 190 F. 289, 111 C.C.A. 254, appeal dismissed 232 U.S. 731, 34 S.Ct. 603, 58 L. Ed. 818; but see Gravelle v. United States, 8 Cir., 253 F. 549, 165 C.C.A. 29 [reservation of a reasonable quantity of land by the secretary for an agency farm]); or, upon his judgment that land authorized to be allotted by Congress ought not to be allotted, refuse to approve an allotment when submitted for his action (Leecy v. United States, 8 Cir., 190 F. 289, 111 C.C.A. 254, appeal dismissed 232 U.S. 731, 34 S.Ct. 603, 58 L.Ed. 818; see 31 C.J. 512; 42 C.J.S., Indians, § 50, p. 731).

*Status of Lee Arenas and Guadaloupe Arenas under the 1927 schedule of allotments: Also status of Francisco Arenas and Simon Arenas (both deceased in 1927) under the 1927 allotment schedules:*

We have heretofore seen that, pursuant to the recommendations of the Commissioner of Indian Affairs, contained in let-

ter dated December 22, 1926, to the Secretary of the Interior [7] (Court's Exhibit 17) and approved by the Secretary on January 5, 1927, the Commissioner by letter dated January 8, 1927, advised Special Allotting Agent, H. E. Wadsworth, to proceed with the preparation of a new allotment schedule and to include as selectees only those members of the Palm Springs Indian Band who consented in writing to receive an allotment; and thereupon Lee Arenas and Guadaloupe Arenas for the first time, on March 19, 1927, requested that they each be given an allotment of land on the Palm Springs Indian Reservation (Court's Exhibit 18), the same land called for on the 1923 allotment schedule.

Because of the uncertainty on the part of the Government agents as to the legal status of Indians on the 1923 schedule who died prior to the making up of the 1927 allotment schedule, H. E. Wadsworth, on or about May 9, 1927, in accordance with the instructions contained in the letter of January 8, 1927, from the Commissioner of Indian Affairs, and the letter of March 14, 1927, from the Commissioner of Indian Affairs, concluded the preparation of a schedule of selections for allotment containing the names of twenty-four Indians of the Palm Springs Indian Band and a description of the land designated as the selection of each of those twenty-four Indians, including Lee Arenas and Guadaloupe Arenas (then living) and Francisco Arenas who died on October 4, 1924, and Simon Arenas, who died on February 18, 1925. H. E. Wadsworth attached to this 1927 schedule of allotments a certificate dated May 9, 1927, substantially the same as that attached to the 1923 allotment schedule, but he stated therein that the listings of allotments, *which began on June 1, 1923,* were completed on May 9, 1927, evidently superseding the 1923 allotment schedule with the 1927 schedule.

---

[7] "United States Department of the Interior, Office of Indian Affairs, Washington, Dec. 22, 1926.

"The Honorable The Secretary of the Interior,

"Sir:

"The question of allotments of land to the Indians of the Mission reservations in Southern California has received careful consideration, and there are submitted herewith my conclusions and recommendations as to the policy I believe should be pursued relative to this matter. * * *

"Very recently Assistant Commissioner Meritt telegraphed from Riverside, California, with respect to Mission allotments that 'allotment should be made to Mission Indians who desire them but not to objectors.' Mr. Meritt assures me that in his opinion this plan if carried out will meet the approval of a majority of persons in California who are interested in this subject, including many of the Indians concerned.

"There is ample authority of law for making allotments to the Mission Indians, and some of the reservations have already been allotted * * *. From the best information available the Indians of these reservations are progressing and appear to be well satisfied with conditions.

"It is my opinion that if we should proceed to allot the Indians on the other Mission reservations *who desire allotments*, and for which each allottee would receive a trust patent, it would be for their best interests and improved conditions would follow naturally. Moreover I believe that if this were done, other indians who are now classed as objectors, and those who oppose allotments of any character, would soon fall in line and request that they too be given their proportionate share of the allottable areas.

"Twenty-five year trust patents were issued to the various Mission bands pursuant to the Act of January 12, 1891 (26 Stat. 712) which Act also authorized allotments to individual Indians, the patents in such cases to supersede the outstanding patents issued in the names of various bands. The Act of March 2, 1917 (39 Stat. 969–976) amended the Act of January 12, 1891, supra, with respect to the method of allotment as to areas. * * *

"It is, therefore, recommended that this Office be authorized to revise the schedules now pending so as to eliminate the names and selections of those Indians who do not desire allotments at this time, and as revised to present the schedules for Departmental consideration with a view to approval and the issuance of trust patents as authorized by law. To accomplish this it is proposed to obtain the written consent of each Indian who desires to receive an allotment on the particular reservation of which he is a member. * * *

"Respectfully,

"Chas. H. Burke, Commissioner.

"Approved Jan. 5, 1927,

"Hubert Work, Secretary."

(Court's Exhibit 17)

428

■ In view of the fact that the court is deciding that all four Indians involved in this suit acquired vested rights to the land claimed by them under the 1923 allotment schedule as of June 21, 1923, it will not be necessary to spend a great deal of time on the 1927 schedule of allotments. It is obvious to the court that if none of the Indians had obtained any vested rights under the 1923 allotment schedule, Francisco Arenas, who died on October 4, 1924, and Simon Arenas, who died on February 18, 1925, could have obtained no vested rights under the 1927 schedule of allotments, they having died prior thereto, and the placing of their names thereon, out of an abundance of caution on the part of agent H. E. Wadsworth, to protect whatever interest they might have had, would be of no avail. Their rights would have been merely a "float" and would have died with them.

"Statutes providing for allotment do not ordinarily permit allotment and patent in the name of a deceased Indian (LaRoque v. United States, 239 U.S. 62, 36 S.Ct. 22, 60 L.Ed. 147, affirming, 8 Cir., 198 F. 645, 117 C.C.A. 349)." 31 C.J. 512; 42 C.J.S.Indians, § 51, p. 731.

■ Lee Arenas and Guadaloupe Arenas, however, even though they had obtained no vested right under the 1923 allotment schedule, would be in a different category under the 1927 allotment schedule for they were both alive on March 19, 1927, Guadaloupe Arenas not having died until March 26, 1937, and both had requested in writing (court's exhibit 18) that they be given allotments to the identical parcels of land formerly allotted to them under the 1923 allotment schedule. Obviously, if acceptance on the part of the Indians was the determinative factor in this case, Lee Arenas would be entitled to recover under the 1927 allotment schedule. For the same reason that the court is holding that Lee Arenas is entitled to receive the interest of Guadaloupe Arenas as her heir at law and next of kin under the 1923 allotment schedule, it would be compelled to hold for him likewise as her heir at law and next of kin under the 1927 allotment schedule if the 1923 allotment certificate issued to her had been ineffective solely by reason of her nonacceptance of the same. The only difference in status of Lee Arenas and Guadaloupe Arenas under both allotment schedules is the fact they declined to accept their allotment certificates under the 1923 schedule, but did request them in writing under the 1927 schedule, which the court has concluded, however, is inconsequential in view of each of them being non sui juris. Strengthening Lee Arenas' claim to his land is a stipulation entered into between counsel that during the years 1926 through 1942 the plaintiff caused to be installed on the selections of land described in the third amended complaint improvements approximating $1200. (Reporter's transcript of proceedings, p. 148.)

*Plight of the Indians and conclusion of the court:*

The condition of the Indians in every part of the United States has indeed been a deplorable one, from the first day of our social and commercial intercourse with them. As stated by the Supreme Court in this case: "The Mission Indians had deserved well and fared badly." They were persecuted for many years, losing their land rights and when the plight of these Indians was brought to the attention of Congress, Congress enacted the Act of January 12, 1891, 26 Stat. 712–714. They did not have the institutions of civilized life to guard their nationality and their property against the frauds and the vices of rapacious traders and land pirates, nor the arts of civilized life with which to gain subsistence. These are obstacles to their preservation which we, in our efforts for their advantages, have perseveringly, but as yet vainly, endeavored to overcome. Abstractly considered, our conduct toward them, and the doctrines of public right which govern it, are marked by many traits of injustice. Dictates of duty and good conscience demand that, within the law, we should give them that to which they are entitled. The Indians are on our hands. They have sunk to what they are, if not by us, yet through us. We have assumed the guardianship of them and have pledged ourselves, by stipulation after stipulation, and by one Act of Congress after another, to watch over their welfare and happiness. Our dealings with them, by custom and through our statutes, should not be merely bona fide, but cum uberrima fide.

Counsel for the plaintiff will prepare Findings of Fact and Conclusions of Law and a Judgment in accordance with this opinion for the signature of the court within ten days after notice of this ruling, first submitting same to counsel for the defendant for approval as to form.